**J. L. SMITH, Plaintiff–Appellee,**

v.

**The DEPARTMENT OF AGRICULTURE OF the STATE OF GEORGIA et al., Defendants–Appellants.**

No. 78–3310.

United States Court of Appeals, Fifth Circuit.

Nov. 19, 1980.

Rehearing and Rehearing En Banc Denied Jan. 2, 1981.

Arthur K. Bolton, Atty. Gen., Carl C. Jones, Asst. Atty. Gen., Atlanta, Ga., for defendants–appellants.

---

Hatcher, Stubbs, Land, Hollis & Roths-child, Richard Y. Bradley, Jerry A. Buchanan, Columbus, Ga., for plaintiff–appellee.

Before GEE and RANDALL, Circuit Judges, and LYNNE,* District Judge.

LYNNE, District Judge:

This appeal involves a challenge to the constitutionality of a rule or regulation of the Department of Agriculture of the State of Georgia, whereby non–residents of Georgia are assigned to inferior sales locations at the Georgia State Farmers Market in Columbus, Georgia ("Columbus Farmers Market"), during periods of crowded conditions. The District Court found that the rule violated both the Equal Protection Clause and the Commerce Clause of the United States Constitution. We affirm solely on the ground that the rule violates the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3.

### I.

The Columbus Farmers Market is owned and partially financed[1] by the State of Georgia, and operated by the State Department of Agriculture. Individuals who wish to sell their produce at such market must acquire a license from the Georgia Department of Agriculture and rent space therein. The market consists of three separate selling areas from which individual growers sell their produce to the general public. Two of the selling locations are "elevated shed" areas, and the third has been designated the "drive–through" shed. Based upon substantial evidence in the record, the trial court found that the elevated sheds are much more desirable locations from which to sell. In comparison with the drive–through shed, the elevated shed areas afford better protection for produce from the sun and rain, and superior produce display location, more readily available customer parking, and better accessibility for the farmers to load and unload their produce. Findings of Fact ¶ 4, App. 47.

Plaintiff–appellee J. L. Smith is a resident of Phenix City, Alabama, and is engaged in farming operations in Russell and Lee Counties, Alabama. Smith has sold his produce at the Columbus Farmers Market over a period of approximately twenty years. Until 1973, he was assigned space at the market without regard to the fact that he is a non–resident of the State of Georgia.

In 1973, however, the Georgia Department of Agriculture instructed its Columbus Market manager that space assignments at the market were to be made on the basis of state residence, with preference to residents of the State of Georgia. Accordingly, at times when all farmers could not be accommodated in the elevated shed area, non–resident farmers were to be relegated to the drive–through shed. The sole basis for the assignment of Alabama farmers to the less desirable shed is the fact that they are non–residents of the State of Georgia. Findings of Fact ¶ 5, App. 47. Most significantly, the admitted purpose of the rule was to give a preference to Georgia residents over non–residents of Georgia, thereby providing a competitive advantage to Georgia farmers.[2]

During the selling season of 1978, Smith was told to move his produce sales from an elevated shed to the drive–through shed. When he refused, he was told that his

---

* District Judge of the Northern District of Alabama, sitting by designation.

1. In the fiscal years 1975–76, 1976–77 and 1977–78, the percentage of the Columbus Farmers Market's operating expenses which were funded by the State of Georgia ranged from approximately 39.4% to 45.4%. *See* Record at 56–58.

2. "Witnesses for the Defendants testified that the purpose for the method of assignment was to give preference to Georgia residents over residents of other states." Findings of Fact ' 6, App., 47. Moreover, appellants have virtually conceded the underlying purpose of the rule by arguing that "the burden placed upon interstate commerce *to promote an in -state industry* . . . fosters a legitimate state interest . . ." Brief for Appellants 19 (emphasis supplied).

license was subject to suspension or revocation for failure to move.

Smith filed suit on July 5, 1978, seeking injunctive and declaratory relief and claiming that the regulation giving preference to Georgia residents violated the Commerce Clause, the Equal Protection Clause and the Privilege and Immunities Clause. After an evidentiary hearing, the district court entered a judgment declaring the rule violative of both the Commerce Clause and the Equal Protection Clause and permanently enjoining the enforcement of the regulation. Because we hold that the regulation violates the Commerce Clause, it is unnecessary to address the merits of the other grounds advanced by appellees.

## II.

The threshold issue involved in this appeal is whether the regulation of the Georgia Department of Agriculture is subject to scrutiny under the Commerce Clause at all. Two recent decisions of the United States Supreme Court indicate that the resolution of this issue depends upon whether the defendants were acting in a proprietary capacity on the one hand or in a regulatory capacity on the other. *See Reeves v. Stake,* —— U.S. ——, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

### –A–

In *Alexandria Scrap,* the Supreme Court rejected a Virginia scrap processor's challenge to a Maryland program to pay a bounty for every Maryland–titled junk car converted into scrap, despite a 1974 amendment to the legislation which imposed more onerous documentation standards on out–of–state than in–state processors. The Court held that *Alexandria Scrap* did not involve "the kind of action with which the Commerce Clause is concerned," 426 U.S., at 805, 96 S.Ct., at 2495, and explained that, "Maryland had not sought to prohibit the flow of hulks, or to regulate the condition under which it may occur. Instead, it has entered into the market itself to bid up their price." *Id.,* at 806, 96 S.Ct., at 2496. The Court concluded that: "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Id.,* at 810, 96 S.Ct., at 2498 (footnotes omitted).

In *Reeves v. Stake, supra,* —— U.S. ——, 100 S.Ct. 2271, 65 L.Ed.2d 244, the Supreme Court reiterated its belief that, "The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law." —— U.S., at ——, 100 S.Ct., at 2277. The Court then held that the State of South Dakota, in a time of shortage, may confine the sale of the cement which it produces at a state–owned plant, solely to residents of South Dakota. The basis of the Court's decision in *Reeves* was again that the State was acting as a market participant rather than as a market regulator.

### –B–

Georgia's role at the Columbus Farmers Market can only be described as a hybrid one. Admittedly, the market is owned, operated and partially financed by the State of Georgia. On the other hand, it is significant that appellants neither produce the goods to be sold at the market, nor engage in the actual buying or selling of those goods. In essence, the State of Georgia has simply provided a suitable marketplace for the buying and selling of privately owned goods. It is this type of activity which was distinguished by the Court in *Alexandria Scrap,* 426 U.S., at 805–806, 96 S.Ct., at 2495–96, and *Reeves,* —— U.S., at —— n. 4, 100 S.Ct., at 2275 n. 4. Accordingly, the State of Georgia cannot be deemed an actual market participant at the Columbus Farmers Market. Rather, its essential role is that of market regulator. As such, appellants' rules and regulations governing the operation of the Columbus Farmers Market are subject to scrutiny under the Commerce Clause.

### III.

■ Having decided that this case involves the kind of activity to which the Commerce Clause applies, it is necessary to determine whether the regulation at issue imposes an impermissible burden on interstate commerce. The purpose underlying the Commerce Clause has been most appropriately stated by Justice Jackson in *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949):

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*Id.*, at 539, 69 S.Ct., at 665.

Traditional Commerce Clause analysis follows the three–pronged inquiry outlined by the Court in *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979):

> Under that general rule we must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Id.*, at 336, 99 S.Ct., at 1736. *See also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct., 844, 25 L.Ed.2d 174 (1970). Under the first step of the *Hughes* test, it is undeniable that the regulation at issue discriminates against interstate commerce on its face by giving Georgia farmers a preference over out–of–state farmers solely on the basis of their residence. Accordingly, the burden falls on appellants to justify the regulation both in terms of the local benefits flowing from it and the unavailability of nondiscriminatory alternatives that would adequately preserve those local interests. *Hughes v. Oklahoma*, 441 U.S., at 336, 99 S.Ct. at 1736; *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977); *Service Machine & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 73 (5th Cir. 1980).

Under the circumstances of the case *sub judice*, appellants' burden is virtually insurmountable. The avowed purpose of the regulation is to give a preference to Georgia farmers over nonresident farmers, thereby promoting an in–state industry.[3] It is precisely this type of parochial legislation which has been subject to the closest scrutiny by the courts:

> The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. *See, e. g., Hood & Sons v. Du Mond, supra; Toomer v. Witsell*, 334 U.S. 385, 403–406, [68 S.Ct. 1156, 1165–1167, 92 L.Ed. 1460]; *Baldwin v. G. A. F. Seelig*, [294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032], *supra; Buck v. Kuy-*

---

3. *See* footnote 2, *supra*. It might be argued that the actual purpose of the regulation was simply to deal with the lack of space available at the Columbus Farmers Market. However, "the evil of protectionism can reside in legislative means as well as legislative ends." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978). In

*City of Philadelphia*, the Court explained: "But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the state unless there is some reason, apart from their origin, to treat them differently." *Id.*, at 626–27, 98 S.Ct., at 2537.

*kendall,* 267 U.S. 307, 315–316, [45 S.Ct. 324, 325–326, 69 L.Ed. 623]. . . .

The crucial inquiry, therefore, must be directed to determining whether ch. 363 [the law at issue] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535–2536, 57 L.Ed.2d 475 (1978). More recently, in *Lewis v. BT Investment Managers, Inc.,* —— U.S. ——, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), the Court was faced with a challenge to a Florida statute which prohibited an out-of-state bank holding company from owning or controlling a business within Florida that sells investment advisory services. In finding the statute unconstitutional, the Court again recognized "the general principle that the Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition." *Id.,* at ——, 100 S.Ct., at 2019.[4]

The clear teaching of *City of Philadelphia* and *Lewis* is that economic protectionism is not the kind of legitimate local purpose that would justify a discriminatory burden on interstate commerce. In light of the admitted purpose of the regulation at issue to promote in-state business by giving preferential space assignments to Georgia farmers, the conclusion is inescapable that it is basically a protectionist measure. Appellants have failed to provide any convincing justification for the preference given to Georgia growers. Indeed, there is obviously no reason to differentiate between Geor-gia and non-resident growers on any basis other than their residence. Accordingly, this case appears to fall squarely within the "virtually *per se*" language of *City of Philadelphia,* 437 U.S., at 624, 98 S.Ct., at 2536.[5]

For the foregoing reasons, we conclude that the district court correctly found that the regulation at issue violates the Commerce Clause, and properly enjoined the continued enforcement thereof.

AFFIRMED.

GEE, Circuit Judge, specially concurring:

The admirable opinions by my colleagues in this close case put each of the opposing positions better than could I. Reading either alone, my impulse is to concur. Since this is so, I write briefly to set out the somewhat primitive course of reasoning that moves me to join in holding the preference here accorded Georgia producers invalid.

I part company with the dissenting view early, with a statement in its third sentence: "the State [has not] prohibited or limited the flow of trade across its borders." Granted that this were so, I could not disagree with much of what follows in Judge Randall's dissent.[1] But I think the flow is interfered with here, and in an impermissible way, though the question is a very close one.

It is certainly true that the State of Georgia has not acted directly to forbid entry of Alabama produce. It has done no more than disadvantage foreign producers somewhat in their competition with domestic

---

4. *See also, Service Machine & Shipbuilding Corp. v. Edwards,* 617 F.2d 70 (5th Cir. 1980) (holding a Louisiana workers' registration ordinance violative of the Commerce Clause):

The type of discrimination that has been the focus of the Supreme Court's analysis occurs when a state or local law distinguishes between commerce originating within a state and commerce originating outside the state. Most often this discrimination takes the form of economic protectionism, and the Court has consistently held this type of parochial legislation constitutionally invalid. *See, e. g., City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) . . .

5. Having concluded that the regulation does not serve a legitimate local purpose, it is unnecessary to balance the burden of the regulation on interstate commerce against its putative local benefits. "*If* a legitimate local purpose is found, *then* the question becomes one of degree." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (emphasis supplied).

1. I do not imply that merely because it does inhibit that flow it is necessarily invalid, only that the circumstance that it does requires further inquiry.

ones for the Georgia produce market by relegating them to the end of the line in sale–booth assignments–and this, moreover, in a facility that, but for Georgia taxpayers, would not exist. At first blush, this may seem a slight burden, but implicit in the findings of the court below is that it is not slight but significant.[2]

Since this is so and the burden is not de minimis, I am unable to see how the case differs in principle from one in which foreign producers were denied use of the facility entirely.

This being so, and the case being therefore properly seen as one in which *some* market is being interfered with severely–to the advantage of domestic producers and the detriment of foreign ones–the inquiry comes down to answering the question: a market in *what*?

If the market is properly to be viewed as one in sale booths for produce, then Georgia occupies a proprietary capacity as the producer of the booths. And if it does so, then under the *Reeves* and *Alexandria Scrap* decisions of the Supreme Court, Georgia may as a proprietor deal in its booths pretty much as it likes.[3] But if the relevant market be seen as one in vegetables, then Georgia is not their producer or seller and hence does not occupy a proprietary position as to them. Instead, it is one who has focussed and localized an existing market by constructing the physical selling facility in which it is carried on. As such, its activities seem to me more analogous to those of a regulator than to those of a proprietor.

I conclude that this case is one about produce, not about sale booths. The case seems to me, therefore, undistinguishable in principle from one in which the state denies to out–of–state producers the use of principal state highways, relegating them to back roads, or confines the use of a state–built coliseum or theatre to that by entertainers residing in Georgia. The state need not act to aid existing markets by the construction of physical facilities, but where it does, it seems to me that the concept of a common market created by the Commerce Clause requires that foreign and domestic marketeers be treated indifferently. I therefore join in the majority opinion.

RANDALL, Circuit Judge, dissenting:

Because I believe that the Supreme Court's decisions in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), and *Reeves, Inc. v. Stake*, —— U.S. ——, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), dictate a result contrary to that reached by the majority opinion in this case, I respectfully dissent.

As the district court below pointed out at the close of the evidentiary hearing on the merits of this case, "we need to keep in mind what we are talking about."[1] Unlike

---

2. The judge found as a fact that the drive through shed to which plaintiff Smith was relegated by the Georgia preference "is a less desirable location from which to sell produce than the elevated sheds" and concluded that Smith would be irreparably damaged unless the injunction issued.

3. In *Reeves, Inc. v. Stake*, —— U.S. ——, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), the state produced the basic commodity, cement. In *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), the state had enhanced–and therefore partly created a local market in automobile hulks by paying a bounty on them.

1. The district court's remarks at the close of the hearing bear repeating:

Well, as I previously noted, what we have involved here is not any effort on the part of one State to prevent citizens of another State from coming into the State. No effort to prevent citizens of another State from doing business in the State. We have not got anything like that. As I said it has been made to appear from some sources that that is what it's all about but that is obviously not what it's all about.... We are just dealing with the way a State decides to regulate the use of the tax supported Farmers Market. That's all we are doing.

Of course, it's got to where everything these days rises to constitutional proportions. Doesn't make any difference whether its potatoes or tomatoes, everything rises to constitutional proportions. But, all I'm saying is, we need to keep in mind what we are talking about.

Transcript at 95.

I will hereinafter use the word "market" to refer only to the sort of abstract construct used by economists to describe the operation of the

the more typical Commerce Clause case, this case does not involve a State's regulation of an entire private industry; nor has the State prohibited or limited the flow of trade across its borders. We must keep in mind that we are not dealing with regulation of a "market" in the abstract economic sense: Georgia has not sought to regulate the interstate market for the sale of produce generally. Rather, whatever "regulation" is involved in this case relates only to something that is as concrete as an economic market is abstract—a piece of real estate, owned and operated largely at the expense of the State's tax revenues, which, for a fee, offers private buyers and sellers of farm produce a physical marketplace of a particular type and quality. The challenged regulations do not even regulate the allocation of space at physical marketplaces generally, but instead reach only those owned and operated by the State.[2]

Rather, the regulations challenged in this lawsuit amount to no more than selective dealing by the State in its commercial leasing of the choicest spaces at the marketplace owned and operated by the State. For years, when this service was not in such great demand, there was no need to enforce any regulation in allocating the choicest spaces other than a "first-come, first-served" rule. But now, because of changes in the economic market for produce, there are not enough choice spaces in this particular physical marketplace to go around. In other words, the demand for this type of marketplace space at these prices has surpassed the supply, as happened in the cement industry in *Reeves*, —— U.S. at ——, 100 S.Ct. at 2275. Indeed, even when Georgia residents are preferred to producers from other states, there are not enough choice spaces to satisfy the Georgia producers.

The majority opinion considers only briefly the threshold—and in my view, dispositive—question of whether this is "the kind of action [by a state] with which the Commerce Clause is concerned." *Hughes v. Alexandria Scrap Corp., supra*, 426 U.S. at 805, 96 S.Ct. at 2495. The majority opinion describes the State's role in the operation of the Columbus Farmers Market as "hybrid," noting first that the marketplace is owned and operated at a net loss by the State. But the majority concludes that because the State offers a commercial service rather than actually participating in the buying and selling of goods, the State is acting primarily as a "regulator" rather than a "participant" in the produce market.

I cannot find this distinction in the Supreme Court precedents cited by the majority opinion. The type of activity that was distinguished by the Supreme Court in *Alexandria Scrap*, 426 U.S. at 805–06, 96 S.Ct. at 2495–96, and in *Reeves*, —— U.S. ——, 100 S.Ct. at 2275 n. 4, involved states' attempts to prevent privately owned articles of trade from being shipped and sold in interstate commerce—the traditional types of Commerce Clause cases. As the Supreme Court itself noted in describing the cases it was distinguishing in *Alexandria Scrap*, "[t]he common thread in these cases is that the State interfered with the natural functioning of the *interstate market* either through prohibition or through burdensome regulation." 426 U.S. at 806, 96 S.Ct. at 2496 (emphasis added). I think that the majority has failed to demonstrate how the case at bar fits within the line of cases distinguished in *Alexandria Scrap* and *Reeves*, rather than being controlled by *Alexandria Scrap* and *Reeves* themselves.

---

forces of supply and demand on the aggregate sales of a good or service (*e. g.*, the interstate market comprising sales of all farm produce; or, the market for commercial rental space in Georgia). I will use the word "marketplace" to describe the physical property where individual sales of goods take place (*e. g.*, the Columbus State Farmers Market).

2. Even these regulations, limited as they are in scope, demonstrate significant evenhandedness: the State has not issued a complete pro-

hibition of out of state sellers at its state-owned marketplaces; though the State requires a license of both in-state and out of state sellers, in neither instance does it charge a fee for the license; the State makes no distinctions among any sellers based on the quality of their produce; and the entry fee it requires of all producers is keyed to the size of each seller's truck, without regard to whether the seller is from Georgia or elsewhere.

The majority states that the State's "essential role is that of market regulator." *Supra* at 1083. If by that the majority means that the State is regulating that portion of the interstate produce market (in the abstract, economic sense of that word) that goes on within Georgia's boundaries, I think that the facts do not support that assertion. If the majority means instead only that the State's essential role is that of regulator of this physical marketplace, I fail to see how that takes this case out of the rationale of *Alexandria Scrap* and *Reeves*.[3] In this case, the State of Georgia has entered into the economic market for the provision of physical marketplaces. It no more seeks to regulate the market for marketplace space than it does the market for farm produce; rather, it is a participant in the market for marketplace space. It is selling a service rather than a good. It does so at a net loss, and that loss is made up through tax revenues. For this reason, as part of its proprietary role in regulating its own operations, the State has chosen to allocate selectively its commercial service, awarding the choicest spaces to its citizens, who indirectly bear the deficits in the operation of the marketplace through their tax dollars. This should end Commerce Clause analysis of the State's actions: "'Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others.'" *Reeves, supra,* —— U.S. at ——, 100 S.Ct. at 2277 (quoting *Alexandria Scrap*, 426 U.S. at 810, 96 S.Ct. at 2498). Following *Reeves* and *Alexandria Scrap*, I would hold that the challenged regulation does not offend the Commerce Clause.

Because I would overturn the district court's Commerce Clause holding, I must continue to a brief analysis of the district court's alternate ground for granting relief, the Equal Protection Clause. My conclusion regarding the Commerce Clause, however, largely dictates the outcome of the equal protection analysis. The guarantee of equal protection under the United States Constitution is not a source of substantive rights or liberties, but is rather a right to be free from invidious discrimination in statutory classifications and other governmental activity. Where the statutory classification complained of does not impinge on a right or liberty protected by the Constitution, the validity of the classification must be sustained unless the classification rests on grounds wholly irrelevant to the achievement of any legitimate governmental objective. *See, e. g., Harris v. McRae,* —— U.S. ——, ——, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980); *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961). Since I would hold that the Commerce Clause is not violated by the challenged regulations in this case, the only question is whether the regulation bears a rational relationship to a legitimate state goal. As the Supreme Court said in rejecting the equal protection claim of the plaintiff in *Alexandria Scrap,*

> [i]t is well established, however, that a statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. That [the State] might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional.

426 U.S. at 813, 96 S.Ct. at 2499 (citations omitted). The preference for Georgia producers bears a rational relationship to the legitimate state goal of tailoring its state–subsidized participation in the market for marketplace space most directly to benefit state taxpayers. That is all the Equal Pro-

---

3. Surely the State of South Dakota had regulations governing the operations of its state-owned cement plant, and the incidental effect of those regulations upon interstate commerce was much more drastic than in this case, since the South Dakota regulations effectively stopped goods from even crossing state borders. Yet according to *Reeves*, that did not mean that South Dakota was regulating interstate commerce, or the market for concrete. Rather, South Dakota was acting primarily as a market participant–a seller of goods.

tection Clause requires in this situation. *See id.* at 814, 96 S.Ct. at 2500. I would therefore hold that the challenged regulation does not deny Smith equal protection.

For the foregoing reasons, I would reverse both holdings of the district court below. With apologies to the district judge for stealing his prose while urging that he be reversed, these potatoes and tomatoes do not rise to constitutional proportions.

