| iLEMMON, Justice. *
Several tug boat companies filed this action seeking to enjoin the enforcement of a contract between a competitor towing company and the lessee of a public marine cargo terminal under which the lessee has exclusively employed the competitor to provide harbor tug service to ships that loaded and unloaded cargo at that terminal. In their petition, plaintiffs asserted, among other things, that the operations under the contract violate the Interstate Commerce Clause. After the lower courts denied plaintiffs any preliminary or permanent injunctive relief, this court granted certiorari solely to address the Interstate Commerce Clause issue.

Facts

The Greater Baton Rouge Port Commission is the owner of a bulk cargo marine terminal located on the lower Mississippi River. The construction of the terminal ^pursuant to La.Rev.Stat. 34:1221-1226 was financed by the issuance of general obligation bonds. The Commission immediately upon completion of construction leased the terminal, which includes a dock and a nearby mooring buoy system for ships which load and unload cargo, to a chemical company with an industrial plant adjacent to the terminal. In October 1973, the original lessee assigned the lease to the Ormet Corporation.
The lease, which places responsibility on Ormet for operating, maintaining and repairing the terminal, provides that the terminal “shall be a public marine terminal for loading, discharging, transferring, storing and handling commodities in bulk,” specifying that the terminal is to be used primarily for the businesses of the lessee and its subsidiaries, but, to the extent the terminal is not required for their businesses, is to be made available to the public “without undue discrimination.” [1]
Ormet primarily uses the terminal to import the raw materials for its alumina plant and to export its products. In addition to fulfilling its own needs, Ormet’s terminal operation provides services, such as stevedor-ing, line handling, derrick barges, barge fleeting and the like, to shippers with cargo to be handled and transported to and from ships, barges and railcars. ' Ormet charges *630 fees for these services, and the Commission, which receives approximately $300,000 per year from Ormet as rent for the terminal, has never regulated these charges.
Both the docking and the undocking of the vessels require harbor tug service.[2] Before May 1995, the harbor tug service for the terminal was provided by four ^companies that vigorously competed for the business. The owner of each vessel arranged for its own tug service and negotiated the price and terms of payment with the towing company of its choice.
In April 1995, Ormet decided to provide its own harbor tug service at the terminal after observing the success of a competing private terminal which initiated the exclusive use of a designated towing company in order to avoid costly delays and wharf damage caused by inefficient or negligent harbor tugs. Ormet announced to vessel owners and agents that “[ejffective May 1, 1995, all vessels must arrange for ‘our’ tugs when doeking/undock-ing or any other activity requiring tug service. NO OUTSIDE TUGS EFFECTIVE 05/01/95.” Since Ormet had no tugs or crew for furnishing this service, it chose to seek bids for the service. Bisso Towing Company was the low bidder, and Ormet entered into a “non-exclusive” contract with Bisso,[3] who established a permanent base near the terminal with several tugs and crews available for service. Under this contractual arrangement, Ormet paid Bisso $1,100 per tug for the service and charged shippers a fixed price of $1,450 per tug.[4] Thus Ormet charges shippers a fee for providing this service, just as it charges fees for other services provided to shippers, and makes a profit on providing the service.
In August 1995, plaintiffs, after unsuccessfully seeking relief from the Commission,[5] filed this action alleging they were improperly denied access to the terminal and were damaged economically. Plaintiffs requested injunctive relief on |4the basis that Ormet’s contract with Bisso was illegal and contrary to public policy. Among other things, plaintiffs asserted that Ormet’s requirement for vessels to use only its tugs violates the Commerce Clause in that “[rjequiring carriers to buy Ormet’s harbor tug services is equivalent to assessing a license fee for the privilege of using the public Burnside Terminal.”
The district court, after an extensive hearing, denied the request for injunctive relief. While noting concerns that the contract was “about as exclusive an arrangement as I can imagine,” the district court nevertheless found no violation of the Commerce Clause and no other legal basis for granting the relief sought by plaintiffs.
On appeal, plaintiffs argued that the stifling of competition in favor of Bisso adversely affected tug services used in interstate commerce. Plaintiffs relied on the decision in C & A Carbone, Inc. v. Town of Clarkstown, New York, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), which held that a municipal ordinance requiring all nonhazardous solid waste leaving the city to be sorted at a transfer station built by the city and operated by a designated private contractor, although allegedly intended to preclude unprocessed garbage from entering the stream of commerce, effectively prevented everyone but the favored local operator from performing the initial processing.
The court of appeal affirmed. 96-1333 (La. App. 1st Cir.5/9/97); 694 So.2d 1121. Rejecting plaintiffs’ argument, the intermediate court held that Carbone did not avail plain *631 tiffs in establishing a violation of the Commerce Clause,[6] reasoning:
The instant case can be distinguished from the facts presented in Carbone, because Ormet’s policy of requiring vessels which call at its terminal to utilize its tug services does not regulate or impede the free |5flow of commerce passing through the terminal, but rather, seeks to facilitate and improve the overall efficiency and profitability of terminal operations. This is achieved by avoiding the potential for costly delays in tug assistance, and reducing the risk of damage to vessels and the terminal itself through the use of regular tug crews who are intimately familiar with the particular river currents and eddies which may be encountered by vessels entering or leaving the dock.
While there can be no doubt that tug policy adopted by Ormet results in a nominal increase in shipping costs, it is the opinion of this court that its effects on interstate commerce are merely incidental. Because said policy has been applied in an even-handed manner to all vessels calling at the Burnside terminal, we believe the overall benefits to both shippers and the terminal cannot be held to violate the dormant provisions of the commerce clause.
96-1333 at 12-13; 694 So.2d at 1129. (emphasis added). Thus the court of appeal premised its holding, in part, on the absence of any regulation of commerce.
We granted certiorari to address the Commerce Clause issue. 97-1531 (La.10/10/97); 703 So.2d 588.

The Commerce Clause

The Commerce Clause provides that “Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States. . . .” U.S. Const. art. I, § 8. On its face, the Commerce Clause simply empowers Congress to regulate interstate commerce. This clause, however, historically has been construed as not only empowering Congress, but also limiting the states. Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996 (1852); see generally Laurence H. Tribe, American Constitutional Law §§ 6.3-6.4 (2d ed.1988). The latter limiting aspect is referred to as the dormant Commerce Clause.
Under the dormant Commerce Clause, there is a “virtually per se rule of invalidity” applicable to state regulations that directly discriminate against interstate commerce — i.e., favor in-state over out-of-state economic interests. City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)(striking down a New Jersey law that barred local landfills from importing out-of-state wastes). The dormant Commerce Clause also invalidates state regulations that indirectly discriminate if the regulation imposes an undue burden on interstate commerce. Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). The criteria for determining what constitutes “undue” include:
(1) whether the challenged statute regulates evenhandedly with only “incidental” effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.
Hughes, 441 U.S. at 336, 99 S.Ct. 1727; see also Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).
Historically, the Commerce Clause has been utilized principally in cases involving state taxes and regulatory measures “impeding free private trade in the national market place.” Reeves, Inc. v. Stake, 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); Tribe, supra, § 6-11, p. 431. The Court, in focusing on cases of Commerce Clause violations by state or municipal action in enacting statutes or ordinances, developed an exception when the action by the government is as a market participant, akin to a private party, as opposed to a market regulator. See Hughes v. Alexandria Scrap *632 Corp., 426 U.S. 794, 822 n. 4, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)(Brennan, J., dissenting). Explaining this exception, the Court has stated:
There is no indication [in the Commerce Clause] of a constitutional plan to limit the ability of the States themselves to operate freely in the free market.... Restraint in this area is also counseled by considerations of state sovereignty ... and “the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.” Moreover, state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Ev-' enhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause.
Reeves, 447 U.S. at 436-38, 100 S.Ct. 2271. Stated otherwise, “[w]hen a state government regulates or taxes, it turns over nothing that belongs to it; rather, it compels private action through the exercise of raw governmental power. In contrast, when a state government buys or sells, it is controlling and distributing its own resources.” Dan T. Coenen, Untangling the Market-Participant Exemption to the Dormant Commerce Clause, 88 Mich. L.Rev. 395, 422 (1989). The distinction between a state’s regulating and taxing, as opposed to a state’s buying and selling, often is the focal point courts consider when addressing the threshold question of the existence of a governmental regulation of commerce in applying the dormant Commerce Clause analysis.

State Regulation

The dormant Commerce Clause applies only to “state regulation” that burdens interstate commerce and not to burdens imposed by private actors. Note, Kevin W. Barrett, Federal Limitations on Target Defensive Tactics: Applying Edgar v. Mite Corp. To the “Private Conduct” of Target Directors, 64 Wash. L.Q. 1187, 1195 (1986). While Ormet is a private party, the Commission is a public body, and its acts are those of a state actor subject to constitutional constraints. The issue is whether the Commission violated Commerce Clause constraints either by its own actions or its inaction in failing to prohibit the enforcement of Ormet’s contract that allegedly regulates commerce in an unconstitutional manner.
Defendants argue that the Commission’s actions in this case are subject to market participant exception because the Commission acted solely as the lessor of the terminal and, in that role, was a market participant. Plaintiffs counter that the Commission’s action was one of “providing] the marketplace itself,” which was held |gto fall outside the scope of the market participant exception in Smith v. Department of Agriculture of the State of Georgia, 630 F.2d 1081, 1083 (5th Cir.1980), cert. denied, 452 U.S. 910, 101 S.Ct. 3040, 69 L.Ed.2d 412 (1981).
In Smith, the State of Georgia promulgated a preference in its farmers’ market for instate growers in renting out prime spaces at the market. The Court characterized the state’s role as a “hybrid” one of providing “the marketplace” for buying and selling, reasoning that while the state owned, operated and partially financed the market, the state did not engage in buying and selling of the farm products sold there, but “simply provided a suitable marketplace for the buying and selling of privately owned goods.” 630 F.2d at 1081. Thus the Court held that the State was not a market participant and the exception was inapplicable to the Commerce Clause analysis of the governmental regulation that favored local farmers.
The Smith decision is distinguishable from the instant case in that it involved a preferential regulation directly issued by the State of Georgia. There was no such direct regulatory action by the Commission in this case. The Commission’s actions, merely as the lessor of a marine terminal, were those of a market participant, in competition with other terminals, rather than a market regulator. Plaintiffs have failed to establish any action by the Commission that constitutes market regulation on which to base a Commerce Clause challenge.
*633 The issue as to the Commission’s inaction is whether the private contractual arrangement between Ormet and Bisso is so sufficiently connected to the Commission’s regulatory role as to constitute state regulation.
State action questions arise when the entity who allegedly violated the Constitution claims it was not acting on the government’s behalf. A private actor is tree to determine with whom to deal and to fix the terms under which to buy and sell |9in the marketplace. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).[7]
Plaintiffs contend that discrimination by a private lessee on state-owned property can constitute unconstitutional state action when there is a symbiotic relationship between the private lessee and the public lessor. A “symbiotic relationship” is said to exist when the actions provide such tangible aid to both the alleged private wrongdoer and the government that the state and private actor become, in effect, “joint venturers” and the alleged wrongdoer’s beneficial ties to the state justify subjecting its actions to constitutional scrutiny. John E. Nowak et al., Constitutional Law 513-14 (2d ed.1983).
Here, plaintiffs argue that a symbiotic relationship exists between Ormet and the Commission based on the following factors: (1) the public ownership of the terminal; (2) the lease requirements imposed on Ormet to make the terminal available to the public “without undue discrimination”; (3) the Commission’s statutory obligations under La.Rev. Stat. 34:1223 C and E to “regulate the commerce and traffic within such port area in such a manner as may, in its judgment, be for the best interest of the state” and not to grant an exclusive franchise to any carrier; and (4) the Commission’s collection of sizea-ble annual rent from Ormet. In support of this contention, plaintiffs cite the seminal case on symbiotic relationship, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
The Burton case, like the present case, involved a private party leasing from the state a building constructed by the state and receiving privileges from the state. However, the similarity ends there. Burton raised the entirely different legal issue of whether the private party lessee’s racially discriminatory action could be the subject | i0of Fourteenth Amendment scrutiny. Holding that the lessee’s discriminatory action was not “so purely private” as to fall outside the broad reach of the Fourteenth Amendment, the Court concluded that the public lessor’s inaction amounted to condoning the discriminatory decision and rendered the private lessee and the public lessor joint participants in the constitutional transgression. Moreover, the Court was careful to confine its decision to the facts and circumstances of the case, stating that it was not rendering a decision applicable to all state lease arrangements and commenting that state action decisions were to be made ad hoc by “weighing circumstances.”[8] 365 U.S. at 722, 81 S.Ct. 856.
While the state action concept was broadly construed in Burton to apply to state inaction, that result may be attributable to the broad constitutional language empowering Congress to enforce the Fourteenth Amend *634 ment by all appropriate means. The Commerce Clause contains no such language. Indeed, Commerce Clause analyses historically have been directed at state action taken in a sovereign capacity.[9]
| nThe Court took a narrower view of state action which is a product of a private actor’s decision in San Francisco Arts & Athletics v. Olympic Committee, 488 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). There, the Court declined to find a symbiotic link between the Olympic Committee, which was a privately incorporated entity, and the government. The Court noted that it “has held that a government ‘normally’ can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be that of the [government.]” 483 U.S. at 546, 107 S.Ct. 2971 (collecting cases). Absent that degree of ‘“close nexus’ between the [government] and the challenged action,” the challenged action cannot be characterized as state action. 483 U.S. at 547 n. 29, 107 S.Ct. 2971. Hence, when the private entity’s decision is, at most, merely approved by or acquiesced in the government, the private entity’s action likely will not be characterized as state action.
The reasoning of the Olympic Committee decision applies here. Plaintiffs have not alleged that the Commission compelled or encouraged Ormet’s harbor tug contract. Plaintiffs have alleged only that the Commission’s refusal to prohibit, and its consequent acquiescence in, the contract constituted state regulation. This acquiescence alone, under the facts and circumstances of this case, is insufficient to amount to state regulation for purposes of Commerce Clause analysis.
We conclude that neither the Commission’s actions as lessor nor its acquiescence in Or-met’s private contract is state regulation that violates the Commerce Clause.
| isDecree
For the foregoing reasons, the judgments of the lower courts are affirmed.
JOHNSON, J., dissents.
KNOLL, J., dissents and assigns reasons.

 Kimball, J., not on panel. Rule IV, Part 2, § 3.

. The original lease also provided that all rules, regulations, tariffs, rates and charges for use of the terminal were subject to the Commission’s approval, but that requirement was deleted by addendum dated January 1, 1992.

. Harbor tug service is required because the vessels are unable to maneuver into position alone, being unable to navigate laterally in the fast-moving current of the lower Mississippi River. The services of at least two harbor tugs are required per vessel that docks at the terminal.

. The contract provides that Ormet is not obliged to use Bisso tugs and that either Bisso or Ormet may contract with other tug companies if the need arises. However, Ormet conceded that it currently uses only Bisso tugs, assertedly in order to take advantage of the benefits of a single harbor boat service.

. Although disputed, there is evidence that the $1,450 charge is a competitive rate.

. A month before this action was filed, plaintiffs and several shippers and agents presented to the Commission their objections to Ormet’s arrangement. Deciding that Ormet was not violating its lease, the Commission tabled further consideration of the issues.

. While the court of appeal also addressed several other issues raised by plaintiffs, our grant of certiorari in this case limited argument to the Commerce Clause issue. We thus do not address the other issues.

. This distinction between proprietary participation in the market and state regulation is also the basis for the market participation exception discussed elsewhere in this opinion.

. State action for Commerce Clause purposes arguably may be narrower than state action for Fourteenth Amendment purposes for two reasons:
First, the values at stake for the latter purposes may strike the Court as of a higher order of importance than those at stake for the former purposes particularly given Congress’ authority and capacity to act under the commerce clause if the Court errs in favor of the state.... Second, the states may be viewed as the pri-maiy lawmakers in ordering and structuring private activity — that is, in enabling private conduct. The states' role in providing structures for “private law" would be threatened by an expansive version of state action doctrine in this context.
Paul N. Cox, The Constitutional “Dynamics" of the Internal Affairs Rule—A Comment on CTS Corporation, 13 J. Corp. L. 317, 344 n. 153 (1988). In an analogy between state action under the Fourteenth Amendment and state regulation under the Commerce Clause, it is important to consider that the particular constitutional right at issue fixes the "parameters” of state action. Tribe, supra at § 18-3.

. In any event, the precedential value of Burton, even in the traditional Fourteenth Amendment state action setting, may be questionable in light of the Court's passing footnote reference to it in the subsequent case of San Francisco Arts & Athletics v. Olympic Committee, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). See Tribe, supra at § 18-3 n. 13 (noting that Burton has often been cited but seldom followed).