N.R. SMITH, Circuit Judge,
dissenting in parts III.B., III.C., IV.B., IV.C., and TV.E. of the majority opinion:
I must dissent from the majority opinion because: (1) the market participant exception to preemption does not apply. Dray-age services (not port services) form the relevant market, and the Port of Los Angeles (the “Port”) acts as a regulator of drayage services. (2) Even assuming the Port qualifies as a proprietor, the off-street parking provisions are preempted, because they affect parties unrelated to contractual obligations to the Port. (3) The placard provision is preempted and not saved by the market participant doctrine or the safety exception, because California cannot revoke access to channels of interstate commerce and identification requirements on motor carriers are expressly preempted under 49 U.S.C. § 14506(a).
I. Market Participant Exception
The Port acts as a regulator (rather than a market proprietor) of drayage services. It is therefore ineligible for the “market participant” defense to federal preemption. We apply a two-prong test for distinguishing proprietary from regulatory actions:
First, does the challenged action essentially reflect the entity’s own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?
Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011, 1023-24 (9th Cir.2010) (citation omitted). If the answer to either question is yes, the market participant exception applies. Id. at 1024.
The Port’s regulation of drayage services does not qualify as “efficient procurement” of needed services. The Ninth Circuit has no controlling precedent on this point. However, the Fifth Circuit, in Smith v. Department of Agriculture of the State of Georgia, concluded that mere ownership of a facility does not make the government a participant in the markets operating in that facility. 630 F.2d 1081 (5th Cir.1980); cf. Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1057-58 (9th Cir.1987) (holding that a city “controlling] easements in the area beneath city streets, a commodity with value____ [with which] the city competes with other entities!,] ... is not a market participant in the setting of franchise fees for easements under public streets”). In Smith, the Fifth Circuit held that Georgia acted as a market regulator when it leased booths to farmers at a state-owned-and-operated farmer’s market that gave preferential treatment to Georgia farmers. Georgia acted as a regulator, rather than a proprietor, because it (1) did not “produce the goods to be sold at the market,” (2) did not “engage in the actual buying or selling of those goods,” and (3) had “simply provided a suitable marketplace for the buying and selling of privately owned goods.” Id. at 1083. As the district court in this case suggested in an earlier order, Am. Trucking Ass’ns., Inc. v. City of L.A., 577 F.Supp.2d 1110, 1120 *411 (C.D.Cal.2008), and a concurring judge in Smith emphasized, the outcome of this test depends on the definition of the market: “[i]f the market is ... one in sale booths for produce, then Georgia [is a proprietor] of booths.... But [because] the relevant market [is] one in vegetables, ... [and] Georgia is not their producer or seller,” Georgia is not a proprietor. Smith, 630 F.2d at 1086 (Gee, J., concurring).[1]
The majority states that the “efficient procurement” prong “is useful in cases where the government is buying goods or seeking services, but it is not the be-all- and-end-all of proprietary action.” Maj. Op. at 399 (footnote omitted). Instead, the real inquiry is distinguishing between propriety and regulatory action. See id. In determining whether actions are “as a market participant or regulator, a court must examine whether the ... government has imposed restrictions that ‘reach beyond the immediate parties with which the government transacts business.’ ” Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist., 952 F.2d 1173, 1178 (9th Cir.1992) (citing White v. Mass. Council of Constr. Emp’rs, 460 U.S. 204, 211 n. 7, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) and S.-Cent. Timber Dev. v. Wunnicke, 467 U.S. 82, 95, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)).[2] “In White, ... Boston did not reach beyond the immediate parties by requiring contractors to hire local workers because everyone affected by the order was, ‘in a substantial if informal sense, working for the city.’” Id. (citing White, 460 U.S. at 211 n. 7, 103 S.Ct. 1042). “In contrast, the Court in Wunnicke found that the Alaska timber processing requirement constituted a ‘downstream’ regulation prohibited by the commerce clause.” Id. (citing Wunnicke, 467 U.S. at 95, 104 S.Ct. 2237).
Here, the Port reaches beyond the immediate parties with whom it transacts, because it does not transact business with drayage service providers. Unlike the rules requiring contractors to hire local workers in White, the Port does not require the shipping lines and stevedoring companies (that rent terminals) to regulate the drayage service providers. Further, the drayage service providers do not, even in an informal sense, work for the Port. See White, 460 U.S. at 211 n. 7, 103 S.Ct. 1042. Therefore, the Port reaches the limits of the market participation exemption. Id. (privity of contract is not the boundary of the market participation exemption, but “there are some limits on a ... government’s ability to impose restrictions that reach beyond the immediate parties with which the government transacts business.”).
The provision of maritime ports does not form the relevant market here; rather, the market is the provision of drayage services. The Port cannot be a proprietor in this market, because it neither purchases nor provides drayage services.[3] Indeed, *412 the Port does not involve itself in any market activity with the independent contractors and companies providing drayage services. See Amicus Brief of the Center of Constitutional Jurisprudence 11-12. Therefore, the Port regulates third-party drayage providers in its capacity as a regulator, eliminating the Port’s eligibility for the market participant defense.
II. Safety Exception
The majority applies the safety exception in this case by distinguishing Castle v. Hayes Freight Lines, 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68 (1954), and finding that it does not preclude the Port from banning access of motor carriers. Maj. Op. at 402-03.
In Castle, the Supreme Court held that Illinois could not revoke an interstate motor carrier’s access to state highways for repeatedly violating the state highway regulations, because the federal government has assumed exclusive authority over the licensing of interstate motor carriers. 348 U.S. at 63-64, 75 S.Ct. 191. The Court explained that it would be “odd if a state could take action amounting to a suspension or revocation of an inter-state carrier’s [federal governmentj-granted right to operate.” Id. at 64, 75 S.Ct. 191. The Court further elaborated that
[i]t cannot be doubted that suspension of this common carrier’s right to use Illinois highways is the equivalent of a partial suspension of its federally granted certificate. The highways of Illinois are not only used by Hayes [Freight Lines] to transport interstate goods to and from that State but are also used as connecting links to points in other states which the Commission has authorized Hayes to serve. Consequently if the ninety-day or the one-year suspension should become effective, the carriage of interstate goods into Illinois and other states would be seriously disrupted.
Id. Although the state could not revoke access to its highways for operators who repeatedly violated the state’s size and weight restrictions, the state could still (1) resort to “conventional forms of punishment” and (2) rely on federal authorities to protect the state’s interest by mandating compliance with state regulations.[4] Id. at 64-65, 75 S.Ct. 191.
The Port does not dispute that the federal government continues to issue interstate transportation “registrations” or “permits” enabling trucking companies to transport cargo across state lines so long as they comply with federal safety and insurance regulations. See, e.g., Motor Carrier Safety Act, Pub.L. No. 98-554, 98 Stat. 2829 (codified, in part, at 49 U.S.C. *413 § 31144); Trucking Industry Regulatory Reform Act of 1994, Pub.L. No. 103-311, § 201, 108 Stat. 1683.[5] Thus, the preemption analysis in Castle still applies, even if the form of comprehensive federal regulation has changed over the years.[6] Additionally, contrary to the district court’s holding, drayage operations between the Port of Los Angeles and other points (even within California) constitute interstate commerce. They are part of the continuous flow of goods between locations outside California and customers within California. Klitzke v. Steiner Corp., 110 F.3d 1465, 1469 (9th Cir.1997) (“Whether any particular shipment is interstate is determined ... by the essential character of the commerce, manifested by shipper’s fixed and persisting transportation intent at the time of shipment, and is ascertained from all of the facts and circumstances surrounding the transportation.” (internal quotation marks and citation omitted) (emphasis in original)).
Therefore, interstate drayage operations are the regulatory province of the federal government. California agencies may promulgate safety regulations for drayage operators and may utilize “conventional forms of punishment” for violating these regulations (e.g., fines). However, revoking access, under Castle, is an enforcement mechanism beyond the reach of California and its political sub-parts, including the Port.
The opinion attempts to distinguish Castle, because a limitation on access to a single Port does not prohibit the motor carriers from participating in transport of interstate goods to and from the state or rise to the level of the comprehensive statewide ban at issue in Castle. Maj. Op. at 402-03. However, the ban in Castle did not “prohibit” offending motor carriers from participating in interstate commerce or “eliminate” connecting links to other states. Instead, as the Supreme Court characterized it, the ban (1) “partially suspended” the motor carrier’s federally granted permit to travel interstate, and (2) “seriously disrupted” (rather than “eliminated”) the motor carriers’ carriage of goods into Illinois and other states. There were obviously alternatives available to carriers in Castle, whose state licenses were suspended, but the state enforcement scheme placed impermissible burdens on a federally-regulated interstate commercial activity. The same problem arises in this case. Barring access to the Port of Los Angeles — the largest port in the United States and one of only a handful of large commercial deep-water ports on the West Coast — would no doubt “seriously disrupt” drayage carriers’ ability to transport goods from ships to other destinations in and outside California. Indeed, barring access *414 is a “partial suspension” of drayage carriers’ federal permits to transport goods in the stream of interstate commerce.
Thus, although the Port can avail itself of the traditional remedies discussed in Castle, it cannot step into the shoes of the federal government and partially revoke drayage carriers’ access to the channels of interstate commerce. Therefore, the Port cannot justify any of the challenged regulations on the basis of safety. California’s safety regulations cannot disrupt Federal authority over interstate travel of motor carriers.
III. Off-street Parking Provisions
Even if the Port qualified as a proprietor, the off-street parking provisions do not qualify as “efficient procurement” of services. The Port “seeks to affect private parties’ conduct unrelated to the performance of contractual obligations to the [Port].” Johnson, 623 F.3d at 1026. The off-street parking provisions attempt to address political concerns the Port alleges local community members have raised regarding drayage truck parking practices, which are not related to any contracts between drayage providers and the Port.
The off-street parking provisions cannot survive preemption, either because (1) the Port is not acting as a market participant in the “efficient procurement” of services simply by virtue of its ownership of Port facilities, or (2) the agreement’s far-reaching provisions affect conduct beyond any direct obligations of drayage providers to the Port.
IV. Placard Provision
A. Preemption under 49 U.S.C. § 14501(c)
The placard provision (requiring concessionaires to post placards on all drayage trucks when the trucks are “entering and leaving Port property and while on Port property”) may be preempted under 49 U.S.C. § 14501(c), if it relates to motor carriers’ prices, routes, and services. The majority does not determine whether the placard provision relates to prices, routes or services because of its reliance on the safety exception to overcome preemption. Maj. Op. at 409. However, this provision is not saved by the safety exception (as the majority concludes), because the state cannot impede Federal authority to allow motor carriers access to interstate travel, as noted above. Nevertheless, finding preemption under § 14501(c) is not required, because § 14506(a) clearly preempts the placard provision.
B. Preemption under 49 U.S.C. § 14506(a)
The Port-mandated placard is a “form of identification” under 49 U.S.C. § 14506(a), because it identifies a truck as one serving the Port and provides a phone number to report unsafe activity. Section 14506(a) provides:
No State [or] political subdivision of a State ... may enact or enforce any law, rule, regulation, standard, or any other provision having the force and effect of law that requires a motor carrier ... to display any form of identification on or in a commercial motor vehicle ... other than forms of identification required by the Secretary of Transportation.
Because the placard provision requires drayage operators to display “any form of identification on or in a commercial motor vehicle,” the provision is plainly preempted. Further, as explained above, this requirement cannot be saved from preemption as a “proprietary” action lacking the “force and effect of law,” because the Port is acting as a regulator (rather than proprietor) of drayage services.
*415 Y. Miscellaneous
The district court correctly held that the maintenance provision would have only a tenuous effect on prices, routes, and services. See Maj. Op. at 404. The record indicates that the time and cost of such compliance is minimal. The plaintiffs had the burden to show more than a tenuous effect, and they did not. Therefore, even though the majority did not rely on this reasoning, I concur with the conclusion of the majority that the maintenance provision is not preempted. However, I do not agree with the majority that the safety exception would save the maintenance provision for the reasons set out previously.
I agree with the majority that the concession agreements fail the narrow scope prong of the market participant test. Further, I concur that the employee-driver and financial capability provisions are preempted by federal law.

.Also not controlling but persuasive is the case of Fla. Transp. Serv., Inc. v. Miami-Dade Cnty., 757 F.Supp.2d 1260 (S.D.Fla.2010). In Florida Transportation the plaintiffs challenged the Port of Miami’s limitation on the number of stevedores. Id. Regarding the market participant doctrine, the court found the county operating the Port of Miami not to be in the market of stevedoring just because it participates in the market for port services. Id. at 1282 (”[T]he county simply provides a suitable market place that it owns — the Port— for stevedores to offer their services.”).

. Although Wunnicke, 467 U.S. 82, 104 S.Ct. 2237 (1984), is a plurality opinion, we cited its holding with approval in Big Country Foods, 952 F.2d at 1178.

. In virtually every Ninth Circuit case finding that a government entity acted as a market proprietor, the government was actually participating in the marketplace by purchasing goods or services. See, e.g., Engine Mfrs. Ass’n v. S. Coast Air Quality, 498 F.3d 1031 (9th Cir.2007) (holding that a state subdivision acted as a market participant in estab *412 lishing air quality rules governing state and local governments’ procurement of new fleet vehicles); Tocher v. City of Santa Ana, 219 F.3d 1040, 1049 (9th Cir.2000) (holding the City of Santa Ana acted as a market participant in "establishing rules and regulations to guide the formation of contracts for towing services provided exclusively to the City” (emphasis added)).

. California recognized this enduring limit on its authority to regulate interstate motor carriers when it enacted the Motor Carrier Safety Improvement Act of 1996. The Act provides, in part, that if the California Highway Patrol determines a commercial carrier has engaged in "consistent failure” to comply with safety requirements "so as to justify a suspension or revocation of the motor carrier’s motor carrier permit ... for interstate operators, the [Highway Patrol] shall recommend to the Federal Motor Carrier Safety Administration that appropriate administrative actions be taken against the carrier----” Cal. Veh.Code § 34505.6(a) (emphasis added). This enforcement scheme is consistent with Castle in that California relies on federal authorities to revoke an interstate offender’s permit where the state would otherwise revoke an intra state offender’s transportation permit for the same conduct.

. The district court concluded, without analysis, that Castle does not apply, because the FAAA Act was enacted 40 years after Castle. However, the FAAA Act did not expand states’ authority to regulate interstate motor vehicles, even on safety grounds. In addressing this very question, Congress explained that "nothing in these new subsections contains a new grant of Federal authority to a State to regulate commerce and nothing in these sections amends other Federal statutes that govern the ability of States to impose safety requirements.” H.R.Rep. No. 103-677 at 84 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1757.

. The United States, writing as amicus curiae in this case, also argued that Castle and its progeny are still in full effect, explaining "the Supreme Court has recognized that 'comprehensive federal regulation precludes state or local entities from ‘exercising any veto power over’ interstate commerce service providers.' " See Motion Granting in Part and Denying in Part Plaintiff's Motion on Remand for Entry of Preliminary Injunction, Case No. 2:08-cv-04920-CAS-CT, Dkt. No. 155, at 6 (citing Castle, 348 U.S. at 64, 75 S.Ct. 191).