**FLORIDA TRANSPORTATION SERVICE, INC., Plaintiff**

v.

**MIAMI–DADE COUNTY, Defendant.**

Case No. 05–22637–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Nov. 2, 2010.

Jeffrey Bruce Crockett, Mark Alan Journey, Robert Thomas Wright, Jr., Coffey Burlington Wright Crockett et al., Carmen Maria Rodriguez, Law Offices of Carmen Rodriguez, P.A., Miami, FL, for Plaintiff.

Craig Edward Leen, Steven Barry Bass, Wifredo Antonio Ferrer, Dade County Attorney's Office, Miami, FL, for Defendant.

### Amended Order on Motions for Summary Judgment [1]

ADALBERTO JORDAN, District Judge.

Florida Transportation has sued Miami–Dade County under 42 U.S.C. § 1983 for violations of the dormant Commerce Clause based on how stevedore permits are issued for the Port of Miami. Pending are Florida Transportation's motion for summary judgment on liability [D.E. 107] and the County's cross-motion for final summary judgment [D.E. 146]. For the reasons which follow, summary judgment on liability is entered in favor of Florida Transportation for the claims based on the County's denial of stevedore permits in 2003, 2004, and 2005, and summary judgment is entered in favor of the County as to all other claims.

### I. Background

This dispute arises out of the application and enforcement of a County ordinance requiring a special permit for stevedores working in the County-owned Port of Miami. The following facts are based on the parties' joint stipulation of facts and undisputed matters in the record.

### A. County Ordinance § 28A–6

A stevedore loads and unloads cargo and/or baggage in a port [D.E. 169 (Parties' Stipulation of Material Facts) at ¶ 10]. As a general matter, § 28A–6 of the Miami–Dade County Code governs the issuance of stevedore licenses and permits in the County. A stevedore license is sufficient to perform work anywhere in the County, except in the Port of Miami.

To work in the Port of Miami, a stevedore needs (in addition to a license) a permit issued by the port director. As is relevant here, § 28A–6.4(b) requires that the port director, "in making his determination as to the issuance or denial of the permit, shall [in addition to other factors identified in the ordinance] make findings as to the need or lack of need for such permit." Other factors to be considered before a permit is issued, in addition to the

---

1. This order supersedes the initial summary judgment order, reported at 543 F.Supp.2d 1315 (S.D.Fla.2008).

"need determination," are set forth in § 28A–6.4(c). One of these additional factors is "the inability or refusal of license or present permit holders, respectively, to adequately serve new or existing business." *See* § 28A–6.4(c)(5).

Stevedore permits for the Port of Miami expire on January 15 of each year. *See* § 28A–6.6. Upon expiration, a permit may be renewed by the port director when all requirements and procedures set forth in "[§§ ] 28A–6.1 through 28A–6.8 [and other applicable requirements] . . . have been met." *See id.* Thus, the ordinance requires a need assessment for renewal applications too.

**B. STEVEDORES AT THE PORT OF MIAMI**

The Port of Miami competes with other ports in the United States and Latin America for cruise line and cargo work [D.E. 169 at ¶ 19]. The Port has invested millions of dollars on land, equipment, and facility development to attract cruise and cargo traffic [*Id.* at ¶ 20].

Until 1994, the Port had several small cargo terminals competing for its cargo business. To improve the Port's cargo capacity and increase capital investment, the Board of County Commissioners approved the formation of POMTOC—a combination of small cargo terminal operators—to operate one of the Port's three main cargo terminals. Since the formation of POMTOC, the Port's cargo capacity has significantly increased [*Id.* at ¶¶ 21–22]. The other two main cargo terminals are used almost exclusively by two carriers, Maersk and Seaboard Marine [*Id.* at ¶ 18].

As of June of 2002—the date of the last need assessment of record—nine stevedore companies had permits to operate at the Port of Miami:

1. Biscayne Stevedoring
2. Eller–ITO Stevedoring Company
3. Florida Stevedoring, Inc.
4. Hallmark Stevedoring Company
5. Oceanic Stevedoring Company
6. P & O Ports of Florida, Inc.
7. R.O. White & Company, Inc.
8. Seaboard Marine, Ltd.
9. Universal Maritime Services

[D.E. 169 at ¶ 29; D.E. 96–30 (Port Director's 2002 Need Assessment Report) at 1].

A number of these permitted stevedore companies are owned by or are affiliated with the Port's cargo carriers. For example, Universal Stevedoring is wholly owned by Maersk [D.E. 96–30 at 3]; Eller–ITO is owned by two of the current owners of POMTOC; and Florida Stevedoring is an owner of POMTOC [D.E. 169 at ¶ 23]. The relevance of these relationships is explained later.

**C. FLORIDA TRANSPORTATION AND ITS PERMIT APPLICATIONS**

Florida Transportation is a stevedore company based in Broward County, Florida. It provides stevedore services at Port Everglades in Fort Lauderdale, and also operates as a stevedore for the Disney cruise lines at Port Canaveral [*Id.* at ¶¶ 1, 2, 4].

Florida Transportation's president, John Gorman, Jr., has had a stevedore license in Miami–Dade County since 1979 [*Id.* at ¶ 13]. Neither Mr. Gorman nor Florida Transportation, however, has obtained stevedore permits to work at the Port of Miami.

**1. THE PERMIT APPLICATION IN JUNE OF 1999**

Florida Transportation applied for a stevedore permit on June 30, 1999. The following day, a former port employee granted the permit application, erroneously assuming that he was reviewing a renewal application. Once the error was discovered, the port director sent a letter

to Florida Transportation holding the permit in abeyance [D.E. 108 (Florida Transportation's Statement of Facts) at ¶¶ 10–12; D.E. 144 (County's Corrected Response to Statement of Facts) at ¶¶ 10–12].

On July 12, 1999, Florida Transportation sued the County and the port director in state court, seeking reinstatement of its stevedore permit [D.E. 144 at ¶ 16]. This lawsuit was ultimately dismissed with prejudice because Florida Transportation had not first appealed to the Board of County Commissioners. The dismissal was affirmed on appeal [*Id.* at ¶ 16].

The Southeast Florida Employers Port Association—an association representing the stevedores at the Port—sent a letter to the port director on July 15, 1999, concerning Florida Transportation's application. In its letter, the Employers Port Association "strongly object[ed]" to the application, expressed "grave concern" over "destructive competition," and stated that no new stevedores were needed at the Port [D.E. 99–9 (Letter from Southeast Florida Employers Port Association to Port Director) at 1–2]. At his deposition, the port director acknowledged receiving the letter, which he understood as the existing stevedores "protecting their own business," but said he did not consider it in evaluating Florida Transportation's application [D.E. 87–1 (Deposition of Charles Towsley) at 69–74].

On August 12, 1999, the port director sent a letter to Florida Transportation denying its June 1999 application. The stated reasons for the denial were that there was no need for an additional stevedore at the time and that Florida Transportation was not competent to work at the Port because it did not have trained employees who could operate the Port's cranes [D.E. 144 at ¶ 17; D.E. 103–7 (Port Director's August 1999 Denial Letter) at 1]. The port

director explained that he had conducted a need assessment in August of 1999 by contacting the Port's top five cargo carriers and asking them a series of questions. Based upon this survey, the port director found that there were sufficient levels of current stevedore services to meet the Port's needs [D.E. 103–7, Exh. A (Port Director's 1999 Need Assessment Report)]. At his deposition, the port director explained that, as he understood § 28A–6, the need requirement only applied to new applicants [D.E. 87–1 at 63].

## 2. THE PERMIT APPLICATION IN JANUARY OF 2000

On January 14, 2000, Florida Transportation filed another application for a stevedore permit to work at the Port. The port director denied the application on March 1, 2000 [D.E. 169 at ¶ 37]. Citing the August 1999 need assessment report, he explained that "(as has been the case for a number of years) there is no need for additional stevedore permits at the seaport at this time" [D.E. 133, Exh. 17 (Port Director's March 2000 Denial Letter) at 1].

Florida Transportation filed an appeal from the denial. On July 25, 2000, the county manager wrote a memorandum to the Board of County Commissioners urging approval of an accompanying resolution denying the appeal. In that memorandum, the county manager explained that, based on the August 1999 need assessment, the port director had found that the current number of stevedores—nine—was the "optimal number" for efficient operations at the Port [D.E. 133–19 (County Manager's July 25, 2000, Memorandum) at 1]. The county manager further noted that this was not the first time that "a stevedore permit has been denied," and that in prior years new entrants had to "buy a company with an existing permit" or wait until the port director determined there was a need [*Id.*]. The county manager

suggested that Florida Transportation's appeal be denied for the reasons stated in his memorandum [*Id.*].

At the hearing before the Board of County Commissioners, which also took place on July 23, 2000, Florida Transportation argued that the port director was discriminating against the company because it used non-union labor and that he was improperly using need as a pretext for discrimination [D.E. 133–1 (Transcript of July 25, 2000, Hearing) at 12–13]. In response, the port director basically admitted that he used a need assessment only for new applicants like Florida Transportation, but argued that no new stevedores were needed [*Id.* at 19].

On the same date, the Board of County Commissioners, by a vote of 11–0 (with 2 commissioners absent), approved the resolution proposed by the county manager, thereby ratifying the rationales of the port director and county manager and their applications of § 28A–6. This resolution denied Florida Transportation's appeal [D.E. 133–19 (Board's Resolution Upholding Port Director's 2000 Denial of Permit to Florida Transportation) ].

Florida Transportation then filed a petition in state court for a writ of certiorari, alleging that the denial of its permit application violated the U.S. and Florida Constitutions [D.E. 104–15 (Petition for Writ of Certiorari) at 24]. In its response, the County admitted that the Board of County Commissioners had adopted the rationales of the port director and county manager [D.E. 134–21 (County's Response to Amended Petition for Writ of Certiorari) at 8–9]. The state trial court denied the petition for certiorari, and the state appellate court affirmed [D.E. 169 at ¶ 37].

## 3. THE PERMIT APPLICATION IN JANUARY OF 2001

On January 8, 2001, Florida Transportation again applied for a stevedore permit. The port director denied the application on June 11, 2001, stating that there had been "no significant change at the Port of Miami with respect to the need for additional stevedores to adequately service the lines calling at Miami" [D.E. 104–19 (Port Director's June 2001 Denial Letter) at 1]. Florida Transportation again appealed the denial to the Board of County Commissioners.

The county manager, in his report to the Board, explained that the County "Code requires an extensive review of *new* applications for a stevedore permit, including a determination of need for additional stevedores by the port director, a nine-part analysis of the competency of the applicant, and other criteria enunciated in [§ ] 28A–6 of the Code" [D.E. 104–20 (County Manager's Background Report) at 2] (emphasis added). The county manager also explained that the port director, after surveying the Port's largest carriers in 1999, had found that there was no need for additional stevedores at that time, and had denied Florida Transportation's 2001 application because "there has been no significant change at the Port with respect to the need for additional stevedores" [*Id.*].[2] The county manager recommended that the Board of County Commissioners uphold the port director's denial of the permit "for the reasons stated" in his report, the port director's denial letter, and the 1999 survey [*Id.*].

At the hearing before the Board of County Commissioners, Florida Transportation again argued that the denial was discriminatory and based on its status as a

---

**2.** Although the county manager emphasized that "the issuance of stevedore permits is not a right for any applicant" [D.E. 104–20 at 2], the existing permit holders received rubber-stamp approvals of their renewal applications without a need assessment.

non-union company, while the port director responded that the denial was due to "lack of work and need for additional services" at the Port [*Id.* at 1]. The Board adopted a resolution upholding the port director's denial "for the reasons stated" in the county manager's report, the denial letter, and the 1999 survey [D.E. 169 at ¶ 38; D.E. 104–20 (Board's Resolution Upholding Port Director's 2001 Denial of Permit to Florida Transportation) at 1]. Thus, the county manager and the Board again ratified the port director's application of the need assessment *only* to new applicants like Florida Transportation.

### 4. THE PERMIT APPLICATION IN JANUARY OF 2002

On January 24, 2002, Florida Transportation filed yet another stevedore permit application. This time the application was denied based on a new 2002 need assessment [D.E. 96–30 (Port Director's 2002 Report on Status of Need of Stevedore Services)], which found that there was no need for new stevedores at the Port [D.E. 169 at ¶ 39; D.E. 105–3 (Port Director's June 2002 Denial Letter) at 1–4].

In his 2002 need assessment report, the port director wrote that there were nine stevedores permitted to operate at the Port, but noted that the five largest cargo carriers each only used one stevedore [D.E. 96–30 at 2]. The port director also explained that some of the Port's carriers had sister/affiliate stevedore companies (e.g., Maersk exclusively using Universal, a wholly-owned subsidiary) [D.E. 96–30 at 3]. The port director concluded that there was no "need for any additional stevedore services at the Port ... at this time or in the immediate future" [*Id.*]

Pursuant to a new review procedure, Florida Transportation appealed the denial of its application to an administrative examiner and not to the Board of County Commissioners. In its appeal, Florida Transportation argued, among other things, that the stevedore permit ordinance was invalid under the Florida Constitution [D.E. 105–4 (Florida Transportation's Post–Hearing Memorandum) at 14].

The administrative examiner held a three-day evidentiary hearing, at which Florida Transportation was allowed to present witnesses and documentary evidence in support of its position, cross-examine any witnesses offered by the County, and provide argument from counsel [D.E. 105, Exh. 136 (Hearing Transcripts)]. After the evidentiary hearing, the administrative examiner affirmed the denial of the stevedore permit. Significantly, however, the administrative examiner found that "no need analysis is done" for permit renewal applications, and that "once a permit has been issued it will continue to be issued unless and until just cause exists for non-issuance of the permit" [D.E. 106–1 (Administrative Examiner's December 2002 Decision) at 12]. Florida Transportation did not appeal the administrative examiner's decision [D.E. 169 at ¶ 39].[3]

### 5. THE PERMIT APPLICATIONS IN 2003, 2004, AND 2005

Florida Transportation applied for stevedore permits again in 2003, 2004, and 2005. The port director denied these applications because he found (based on the 2002 need assessment) that there was no need for additional stevedores at the Port. Florida Transportation did not appeal these denials [*Id.* at ¶¶ 41–43; D.E. 147

---

**3.** Florida Transportation filed a second permit application in 2002. This second application was denied because a party is allowed to file only one application per year [D.E. 169 at

¶ 40]. Florida Transportation does not challenge the denial of its second application in 2002.

(County's Statement of Material Facts) at ¶¶ 34–36; D.E. 106, Exh. 142 (Port Director's February 2004 Denial Letter); D.E. 106. Exh. 144 (Port Director's March 2005 Denial Letter) ].

#### D. OUT-OF-STATE PERMIT APPLICATIONS

In the last 10 years, the port director granted the one stevedore permit application filed by an out-of-state applicant [D.E. 169 at ¶ 47]. That application was submitted by Seaboard Marine, which is owned by Seaboard Ltd., a Kansas corporation [D.E. 131–2 (Aff. of Ray Mauri) at ¶ 10]. The record is not clear as to exactly when Seaboard Marine obtained its permit, but it was prior to 2002 [D.E. 96–30 at 1; D.E. 104–20 at 2].

#### E. THIS LAWSUIT

Florida Transportation filed this action in October of 2005 against the County and the port director. In its one-count complaint, Florida Transportation alleges that the County's application of the permit ordinance and denial of its applications from 1999 to 2005 violated the dormant Commerce Clause. Florida Transportation seeks declaratory relief, permanent injunctive relief, and damages under 42 U.S.C. § 1983.

On February 16, 2005, Florida Transportation voluntarily dismissed, with prejudice, its claims against the port director. As a result, only the claim against the County remains.

#### II. LEGAL STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See id.* at 323, 106 S.Ct. 2548. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). In making this assessment, a court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," and "resolve all reasonable doubts about the facts in favor of the nonmovant." *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997).

#### III. ANALYSIS

Before considering the merits of Florida Transportation's dormant Commerce Clause claims, I need to determine whether, as argued by the County, any of these claims are barred by the statute of limitations or the doctrines of res judicata or collateral estoppel.

#### A. STATUTE OF LIMITATIONS

As explained below, the § 1983 claims for alleged violations prior to October 3, 2001, are barred by the statute of limitations.

 Florida Transportation filed this action on October 3, 2005, seeking damages (and declaratory and injunctive relief) for the denial of stevedore permits from 1999 to 2005. The statute of limitations for Florida Transportation's claims under § 1983 is four years, borrowing Florida's residual personal injury statute of limitations. *See City of Hialeah v. Rojas,* 311 F.3d 1096, 1103 n. 2 (11th Cir.2002); *Rozar*

*v. Mullis,* 85 F.3d 556, 561 (11th Cir.1996). This limitations period does not begin to run until the facts that would support a cause of action are apparent or should be apparent to a reasonably prudent person. *See Mullis,* 85 F.3d at 561–62.

■ I conclude that Florida Transportation's claims accrued at the time each permit application was denied. The denial of each application made or should have made apparent to Florida Transportation that its rights under the dormant Commerce Clause had been violated. Indeed, Florida Transportation filed actions in state court in 1999 and 2000 to challenge the port director's denial of permits, demonstrating that it was aware at the time of the allegedly illegal conduct. Accordingly, the claims arising from the denial of stevedore permits prior to October 3, 2001—more than four years before the filing of this action—are barred by the statute of limitations.

■ I reject Florida Transportation's contention that the accrual of the claims was delayed under the continuing violation doctrine. Under this doctrine, a claim filed outside the limitations period is not untimely if the violation is caused by a continuing illegal policy. *See, e.g., Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth.,* 502 F.3d 1316, 1322 (11th Cir. 2007); *Bendik v. Credit Suisse First Boston (USA), Inc.,* 2004 WL 736852, *6 (S.D.N.Y. Apr. 5, 2004). The doctrine is based on the "equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1222 (11th Cir.2001) (citation and internal quotation marks omitted). The Supreme Court has made clear, however, that the doctrine does not apply where each alleged constitutional violation is an independent discrete act. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal citations omitted). Thus, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id. See also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998) (continuing violation doctrine does not apply where violations are not continuous in time with one another).

■ Florida Transportation's alleged injuries arise out of distinct and separate denials of distinct and separate yearly applications for stevedore permits. Each application was considered on its merits and separately denied. On these facts, each permit denial triggered an independent and discrete constitutional claim. *See Sameric Corp. v. City of Phila.,* 142 F.3d 582, 599–600 (3d Cir.1998) (continuing violation doctrine did not apply to denial of permit). *See also Center for Biological Diversity v. Hamilton,* 453 F.3d 1331, 1334–35 (11th Cir.2006) (failure to designate a critical habitat for an endangered species was not a continuing violation). Accordingly, the continuing violation doctrine cannot make the pre-October 3, 2001, claims timely. These claims are barred by the four-year limitations period.

## B. RES JUDICATA AND COLLATERAL ESTOPPEL

The administrative examiner denied Florida Transportation's appeal from the denial of its January 2002 application. As set forth below, Florida Transportation's claim arising out of the denial of the January 2002 application is barred by the doctrine of res judicata.[4]

---

4. The County argues that the dismissal of

Florida Transportation's state court actions

Where a prior state judgment or final decision is concerned, federal courts rely on state law to determine whether an action is barred under the doctrine of res judicata (i.e., claim preclusion). *See Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir.2006). Under Florida law, a judgment on the merits rendered in a former suit between the same parties on the same cause of action bars the re-litigation of every claim which was or could have been raised in that action. *See Fla. Dep't of Transp. v. Juliano*, 801 So.2d 101, 105 (Fla.2001). For res judicata to apply, there must be (1) an identity of the "thing" sued for; (2) an identity of the cause of action; (3) an identity of the parties to the action; and (4) an identity of the quality or capacity of the persons for or against which the claim is made. *See, e.g., Tyson v. Viacom, Inc.*, 890 So.2d 1205, 1209 (Fla. 4th DCA 2005).

Florida courts apply res judicata to final decisions of administrative and municipal bodies with "great caution." *See Thomson v. Dep't of Envtl. Regulation*, 511 So.2d 989, 991 (Fla.1987). *See also M.C.G. v. Hillsborough County Sch. Bd.*, 927 So.2d 224, 227 (Fla. 2d DCA 2006); *Miller v. Booth*, 702 So.2d 290, 291 (Fla. 3d DCA 1997). For example, § 83(2) of the Restatement (Second) of Judgments (1982), which was cited with approval in *M.C.G.*, 927 So.2d at 227, provides that an administrative ruling should be given preclusive effect when the administrative proceeding affords the essential elements of adjudication: (1) adequate notice; (2) the right to present evidence and legal argument; (3) a formulation of issues of law and fact for the application of rules to specified parties concerning a specific transaction, situation, or status; (4) a rule

of finality, specifying a point when presentations are terminated and a final decision is rendered; and (5) other procedural elements as may be necessary to make the proceeding a sufficient means of conclusively determining the matter in question.

The administrative examiner's order affirming the denial of the January 2002 application constituted a final decision on the merits. Florida Transportation's failure to appeal, moreover, does not diminish the preclusive effect given to the administrative ruling. *See M.C.G.*, 927 So.2d at 227 (giving preclusive effect to administrative order that was not appealed because "a determination that has become final in a prior case will be given preclusive effect even if it has not been subjected to appellate review"). Furthermore, Florida Transportation *could have* asserted its constitutional claims in the administrative proceedings; the findings of the administrative examiner make clear that Florida Transportation was able to raise constitutional challenges to the application of § 28A–6. Indeed, Florida Transportation argued at the administrative hearing that the ordinance violated the Florida Constitution. Florida Transportation could have raised its federal Commerce Clause claim in the same way that it asserted its state constitutional claim.

Similarly, the administrative proceedings also satisfy the specific requirements for the application of res judicata. Florida Transportation had adequate notice, as demonstrated by the fact that it had sufficient time to subpoena witnesses [D.E. 105 at 7–16]. It also had the opportunity to present evidence and legal arguments at a three-day evidentiary hearing. [*Id.*]. The hearing culminated in a 15–page

filed in July of 1999 and January of 2000 also have res judicata effect. I need not address this argument, as I conclude that Florida

Transportation's claims arising from the denials in 1999 and 2000 are time-barred.

opinion by the administrative examiner applying his conclusions of law to the facts of the case [D.E. 106–2]. After reviewing the hearing transcript, I am convinced that the hearing was a proper forum to conclusively determine and adjudicate Florida Transportation's claims. Accordingly, any claim arising out of the denial of the January 2002 application is barred by res judicata.

■ The order affirming the denial of the January 2002 application, however, has no res judicata effect on Florida Transportation's claims for the denial of its permit applications in future years, i.e., 2003, 2004, and 2005. As I have already concluded with respect to the statute of limitations, each denial gave rise to a new and distinct cause of action. *See M.C.G.*, 927 So.2d at 227 ("The doctrine of res judicata—which requires that the second suit present the identical cause of action as was previously litigated—is not applicable where the claims in the two cases concern different periods of time."). As a result, there is no identity of the cause of action between the administrative order affirming the denial of the January 2002 application and the claims based on the denials in 2003, 2004, and 2005.

■ The administrative examiner's specific factual findings also have preclusive effect under the doctrine of collateral estoppel. Under Florida law, the doctrine of collateral estoppel (i.e., issue preclusion) bars the re-litigation of any issue that has been decided in another action and was essential to the prior adjudication. *See M.C.G.*, 927 So.2d at 226. *See also Christo v. Padgett*, 223 F.3d 1324, 1339–40 (11th Cir.2000) (discussing issue preclusion under federal law). The doctrine "comes into play in a case when in an earlier proceeding involving a different cause of action, the same parties litigated the 'same issues' that are presented once again for decision." *M.C.G.*, 927 So.2d at 226 (internal quotation marks omitted). It applies to administrative proceedings, and the lack of appellate review will not prevent giving a prior finding preclusive effect. *See id.* at 226–27.

■ In the administrative proceedings, the parties did not actually litigate whether the stevedore permit ordinance, as applied, violated the dormant Commerce Clause. Nevertheless, in addressing Florida Transportation's claim that the port director had abused his discretion under the ordinance, the administrative examiner found that "no need analysis is done for renewal applications" [D.E. 106–2 at 13]. He further found that "the simple conclusion to be derived from the disparity between the treatment of renewal applications and the treatment afforded [to Florida Transportation] is that once a permit has been issued, it will continue to be issued unless and until just cause exists for non-issuance of the permit" [*Id.*]. In other words, the administrative examiner found that current permit holders, in practice, are exempted from § 28A–6.4(b)'s need assessment requirement. This factual finding as to how the permit ordinance was applied during the relevant period was essential to the administrative examiner's ruling and is binding on the parties here. In any event, that finding is confirmed by the undisputed deposition testimony of the port director that some existing stevedores (e.g., P & O Ports and R.O. White) had their permits renewed even though they were not doing any work at the Port [D.E. 87–1 at 135–36, 245].

Significantly, the County has not submitted any evidence that renewal permits were processed any differently in 2003, 2004, and 2005 after the administrative examiner made his findings. The record amply demonstrates that the port director and the county manager applied § 28A–

6.4(b)'s need assessment requirement in a discriminatory manner with respect to new applicants from 1999 to 2002, that the Board of County Commissioners expressly ratified and adopted this discriminatory application in 2000 and 2001, and that the port director continued to apply the need assessment in the same discriminatory manner in 2002, 2003, 2004, and 2005. This course of conduct should not be surprising; the port director was merely doing what he had done before, and his way of doing things had been twice blessed and ratified by the county manager and the Board of County Commissioners.

I now turn to the merits of the claims for the permit denials in 2003, 2004, and 2005.

### C. COMMERCE CLAUSE CLAIMS

 The Commerce Clause grants Congress the power to regulate commerce among the states. *See* U.S. Const. Art. 1, § 8, cl. 3; *S. Waste Sys., LLC v. City of Delray Beach,* 420 F.3d 1288, 1290 (11th Cir.2005). This power "presumes a national market free from local legislation that discriminates in favor of local interests." *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 393, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The Commerce Clause is, therefore, not only an authorization for congressional action, but also a restriction on local regulation of interstate commerce. *See Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). To that effect, the Commerce Clause has been deemed to include an implied "negative command" that prevents a state or municipality from " 'jeopardizing the welfare of the Nation as a whole' by 'plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.' " *See Am. Trucking Ass'n, Inc. v. Michigan Pub. Serv. Com'n,* 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005) (inter-

nal citations omitted). This restrictive aspect of the Commerce Clause is known as the dormant Commerce Clause. *See id.*

As explained below, Florida Transportation is entitled to summary judgment on liability as to its claims for the denial of stevedore permits in 2003, 2004, and 2005. The permit ordinance, as applied in those years, violated the dormant Commerce Clause.

### 1. THE APPROPRIATE STANDARD OF REVIEW

 The Supreme Court has adopted a two-tiered approach to determine whether a local regulation violates the dormant Commerce Clause. A local regulation that discriminates against interstate commerce on its face or in practical effect is unconstitutional unless the municipality can establish that a legitimate local interest cannot be served by reasonable non-discriminatory alternatives. *See Dept. of Revenue of Ky. v. Davis,* 553 U.S. 328, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008); *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Island Silver & Spice, Inc. v. Islamorada,* 542 F.3d 844, 846 (11th Cir.2008). *See also Carbone,* 511 U.S. at 392, 114 S.Ct. 1677; *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). The plaintiff bears the initial burden of showing discrimination, and if it does the burden shifts to the government to justify the discriminatory law. *See Island Silver & Spice, Inc. v. Islamorada,* 475 F.Supp.2d 1281, 1289 (S.D.Fla.2007) (internal citations omitted), *aff'd* 542 F.3d 844 (11th Cir. 2008). Discrimination, in this context, "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). If the

plaintiff cannot establish such discrimination, then it must demonstrate that the facially nondiscriminatory regulation's burden on interstate commerce "clearly exceeds" the putative local benefits. This is the so-called "undue burden" test. *See Davis,* 128 S.Ct. at 1808; *Brown–Forman,* 476 U.S. at 578–79, 106 S.Ct. 2080 (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). *See also Carbone,* 511 U.S. at 390, 114 S.Ct. 1677; *Town of Southold v. Town of E. Hampton,* 477 F.3d 38, 47 (2d Cir.2007). Accordingly, "the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce.' " *Or. Waste,* 511 U.S. at 99, 114 S.Ct. 1345 (citations omitted).

There is no "clear line" between local laws that discriminate against interstate commerce (and are subject to heightened scrutiny) and local laws that impose an indirect burden on commerce (and are subject to the undue burden test). *See Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080. *See also Island Silver,* 542 F.3d at 846–47. The distinction is even more hazy when the local law in question favors a mixed group of in-state and out-of-state companies to the detriment of all other competitors—including in-state and out-of-state competitors. The County's stevedore permit ordinance, as applied, falls in this nebulous area; it protects a group of primarily (but not exclusively) local companies by automatically approving their renewal applications without need assessments and essentially excludes all other competitors by subjecting them, as newcomers, to need assessments.

In *Carbone,* the Supreme Court held that a local ordinance which protected a local company from in-state and out-of-state competitors was discriminatory (and thus subject to heightened scrutiny). The ordinance in *Carbone* required all recycling plants in the town to transfer their solid waste to the preferred local transfer station. A local recycling plant challenged the ordinance in state court, arguing that it discriminated against interstate commerce. The trial court entered summary judgment against the local plant, and the New York Court of Appeals affirmed, holding that the ordinance was not discriminatory because it applied "evenhandedly ... regardless of point of origin." *See* 182 A.D.2d 213, 587 N.Y.S.2d 681, 686 (1992). The Supreme Court granted certiorari and reversed, reasoning that local laws that "hoard a local resource ... for the benefit of local businesses" are discriminatory. *See Carbone,* 511 U.S. at 392, 114 S.Ct. 1677. The waste ordinance was of this type because it "squelche[d] competition in the waste-processing service altogether, *leaving no room for investment from outside."* *See id.* (emphasis added).

Justice O'Connor's concurring opinion in *Carbone* sheds some light on how discrimination is defined under the dormant Commerce Clause. Justice O'Connor would have reviewed the waste ordinance under the undue burden test: "Because in-town processors-like petitioners-and out-of-town processors are treated equally, I cannot agree that [the ordinance] 'discriminates against interstate commerce.' Rather [the ordinance] discriminates evenhandedly against all potential participants in the waste processing business, while benefitting only the chosen operator of the transfer facility." *Id.* at 404, 114 S.Ct. 1677 (O'Connor, J., concurring). The majority in *Carbone,* however, rejected Justice O'Connor's more narrow approach to discrimination and concluded that the ordinance was "no less discriminatory because in-state or in-town processors are also cov-

ered by the prohibition." *See id.* at 384, 114 S.Ct. 1677. The Supreme Court reiterated that a local law which blocks all out-of-state investments or participants in favor of a local company is discriminatory, even if it affects other local firms as well. *See id.*[5]

Carbone thus stands for the proposition that a local law that benefits a local company and excludes all out-of-state and all other in-state companies discriminates against interstate commerce. *Carbone* suggests that as long as all out-of-state companies are excluded or affected and at least one local company is favored, there is discrimination against interstate commerce, triggering heightened scrutiny. The basis for a finding of discrimination is that such laws leave "no room for investment from outside." *See id.* at 392, 114 S.Ct. 1677.

Whether the approach of *Carbone* applies to a local ordinance that excludes most, but not all, out-of-state companies is unsettled. In *Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir.2005), the First Circuit considered the constitutionality of a Puerto Rico statute protecting established pharmacies (approximately 8% of which were owned by out-of-state companies) from new competition. The statute required prospective new pharmacies to obtain a certificate of necessity from the health department to operate in the commonwealth. The First Circuit concluded that the stat-ute discriminated against interstate commerce because the health department used the statute to protect "the mostly local group of existing pharmacies from competitive pressure." *See id.* at 53. The First Circuit recognized that the statute also protected some out-of-state pharmacies which were already operating. But it noted that the vast majority of favored pharmacies were local concerns and that there was no requirement that "a favored group must be *entirely* in-state for a law to have a discriminatory effect on commerce." *See id.* at 58–59.

If the First Circuit's approach is correct, the County's permit ordinance is discriminatory as applied. But I do not find the reasoning of *Walgreen* particularly persuasive. A local law which benefits a selected group of in-state and out-of-state companies to the detriment of all other competitors, by definition, does not "discriminate" on the basis of local versus out-of-state origin. Unlike the law in *Carbone*, such laws cannot categorically be said to leave "no room for investment from outside." *See Carbone*, 511 U.S. at 391–92, 114 S.Ct. 1677. *See also id.* at 404, 114 S.Ct. 1677 (O'Connor, J. concurring). Here one of the entrenched stevedores is owned by an out-of-state company, and the excluded newcomer is a Florida company.[6] As a result, the undue burden test applies.

---

5. The Supreme Court somewhat limited *Carbone* in *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 340, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007), which held that a local law which favors a *public* company and excludes all other competitors—local and out-of-state— was not discriminatory, and therefore subject only to the undue burden test. *United Haulers*, however, did not affect the holding of *Carbone* with respect to laws favoring private entities. *See id.* at 338–41, 127 S.Ct. 1786. *See also Davis*, 128 S.Ct. at 1813 ("If instead

the government [in *United Haulers* ] had created a monopoly of favor for a private hauler we would have struck down the law just as we did in. . . . *Carbone* [.]".").

6. That Florida Transportation is based in Florida does not prevent it from mounting a successful dormant Commerce Clause challenge. After all, the successful plaintiffs in *Carbone* and *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949), were local businesses.

This conclusion is consistent with *Southern Waste Systems, LLC v. City of Delray Beach*, 420 F.3d 1288 (11th Cir. 2005), where the Eleventh Circuit ruled that an exclusive agreement in favor of an out-of-state company did not violate the dormant Commerce Clause. In that case, the City of Delray Beach, Florida, issued a request for bids to become the City's exclusive provider of waste collection services for a period of five years. Five companies submitted bids, and the City ultimately selected an out-of-state company. The City then enacted an ordinance insulating the successful bidder from competition, and a local competitor sued under the dormant Commerce Clause. The Eleventh Circuit rejected the constitutional claim, noting that the bidding process "was not only open to out-of-state competitors, but it was, in fact, awarded to one." *See id.* at 1291. *Southern Waste* suggests that a law which potentially favors out-of-state parties over local firms does not discriminate against interstate commerce so as to trigger heightened scrutiny. The existence of interstate discrimination does not (and should not) depend on a calculation of the percentage of out-of-state companies benefitted by a local ordinance. *Cf. Cachia v. Islamorada*, 542 F.3d 839, 842–43 (11th Cir.2008) (facially neutral ordinance whose effect was "to exclude national chain restaurants from competition in the local market" was subject to heightened scrutiny); *Island Silver*, 542 F.3d at 846–47 (ordinance's retail formula provision was subject to heightened scrutiny because it effectively eliminated "all new interstate chain retailers").

That is not to say that non-discriminatory laws insulating a group of primarily local companies from competition do not have a negative impact on interstate commerce. Such laws, though, are best reviewed under the undue burden test, and

should not be subject to heightened scrutiny. *See United Haulers*, 127 S.Ct. at 1797 (non-discriminatory local laws "which treat in-state private business interests exactly the same as out-of-state ones, do not 'discriminate against interstate commerce'" and are subject to the undue burden test). *See also Town of Southold*, 477 F.3d at 49–50 (a local law that does not give an advantage to local companies over out-of-state competitors is reviewed under the undue burden test).

In sum, I agree with the County that the application of the stevedore permit ordinance should be reviewed under the undue burden test. Applying the lowest standard of review here also makes practical sense because the stevedore permit ordinance, as applied, is unconstitutional even under this more forgiving standard. *See, e.g., Medigen of Ky. v. Pub. Serv. Comm'n of W.Va.*, 985 F.2d 164, 166 (4th Cir.1993) (because ordinance was unconstitutional even under the deferential balancing test, it was "unnecessary to decide whether the requirement should be evaluated under a stricter standard").

## 2. APPLYING THE UNDUE BURDEN TEST

Contrary to the County's argument, the stevedore permit ordinance, as applied, significantly burdens interstate commerce and violates the dormant Commerce Clause. First, the ordinance is not applied even-handedly; although the ordinance's text specifies that the need assessment applies to new applications and renewal applications, the port director, with the ratification of the county manager and the Board of County Commissioners, has consistently applied the ordinance to protect a group of existing stevedores and bar the entry of new competitors to the stevedore market at the Port of Miami. Under this protectionist scheme, new competitors are not allowed as long as the entrenched

nine stevedores are willing to serve the Port's need for stevedore services, even if these new competitors could provide identical, better, or expanded services in a more advantageous or cost-effective way. Second, some existing stevedores which were not doing any work at the Port received rubber-stamp approvals when they sought renewals of their permits. This state of affairs completely undermines the County's argument about capacity. At the very least, Florida Transportation should have been allowed to compete with those stevedores like P & O Ports and R.O. White which were not providing any services at the Port for certain periods of time.

The entrenchment at the Port is perpetuated by the potentially incestuous procedure used to determine the need for new stevedores. The port director, in undertaking the need assessments in 1999 and 2002, took into account not only his own observations, but also contacted existing cargo carriers at the Port and asked them if the current stevedores could handle the workload [D.E. 108 (Florida Transportation's Statement of Facts) at ¶ 62; D.E. 144 (County's Corrected Response to Statement of Facts) at ¶ 62]. For example, in 2002 the port director concluded that there was no need for new stevedore permits [D.E. 96–30]. This conclusion was primarily based on a survey of the Port's cargo carriers, all of which generally stated that they were satisfied with the current stevedores. The problem with this survey is that some of these cargo carriers own or are affiliated with permitted stevedores: Maersk wholly owns Universal Stevedoring; two of the current owners of POMTOC own Eller–ITO; and Florida Stevedoring is one of POMTOC's owners [D.E. 96–30 at 3; D.E. 169 at ¶ 23]. It is not surprising that these carriers would vouch for the good job of their affiliates subsidiaries, as they are protecting their own oligopoly. *Cf. Mercantile Tex. Corp. v. Bd. of Governors of Fed. Reserve Sys.*, 638 F.2d 1255, 1267 (5th Cir.1981) (*citing* R. POSNER, ANTITRUST LAW: AN ECONOMIC PERSPECTIVE 124–25 (1976): "[e]conomic theory suggests that, where oligopoly profits are available, a multitude of firms will eagerly seek to enter the market," but the oligopoly is protected because "[b]arriers to entry ... reduce the number of potential entrants"); R. POSNER, ANTITRUST LAW 74 (2d ed.2001) ("[t]he principal examples" of barriers to entry protecting oligopolies "involve legal restrictions on entry, for example certificate-of-need laws in the hospital industry, which impose a regulatory barrier to the creation of new hospitals of the expansion of existing ones"). *See also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1251 (11th Cir.2002) ("[t]he hallmark of an oligopoly is tacit collusion among competitors"); *Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222, 1242 n. 22 (N.D.Ala.2000) (an oligopoly is often marked by "lack of competition").

The stevedore permit ordinance does provide that permits for current holders are to expire every year and that they may be renewed only if all applicable requirements (including the need assessment) have been met. But as the administrative examiner found, as the port director confirmed in his undisputed deposition testimony, as the county manager told the Board of County Commissioners, and as the record convincingly demonstrates, this is not how the ordinance is actually applied. Permits for current stevedores are automatically renewed, and new applications are denied as long as the already-established stevedores can adequately serve the market. The entrenched nine stevedores are not subjected to the need assessment requirement imposed on newcomers, despite the text of the ordinance, even when they are not doing any work at

**1278**

the Port.[7]

The administrative examiner's findings and the port director's testimony as to the consistent and discriminatory application of the ordinance are confirmed by the issuance and subsequent revocation of a stevedore permit to Florida Transportation in 1999. Florida Transportation's application was initially granted under the erroneous assumption that Florida Transportation was a current permit holder merely seeking renewal. When the error was discovered, the port director held the permit in abeyance and ultimately denied the application in part because there was no need for new stevedores at the Port. In other words, Florida Transportation did not get the benefit of a rubber-stamp approval. A more vivid example of an ordinance selectively applied to protect entrenched firms is difficult to imagine.[8]

Given the way the permit ordinance has been applied, the nine permitted stevedores are protected and insulated from any new competition. And, as noted above, while the port director was denying Florida Transportation's permit applications in 2003, 2004 and 2005, he was renewing the permits of some existing stevedores who were doing any work. This is a significant burden on interstate commerce, as the County has in essence removed the stevedore market at the Port of Miami from the local, state, and national markets. *See Davis,* 128 S.Ct. at 1813.

To assess the burden that the stevedore permit ordinance (as applied) places on interstate commerce one need only assume

what would happen if all port-owning municipalities closed off their ports for the benefit of a group of existing and primarily local stevedores. *See Healy v. Beer Institute, Inc.,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (an ordinance's effect on interstate commerce "must be evaluated not only by considering the consequences of the statute itself, but also by considering ... what effect would arise if not one, but many or every, State adopted similar legislation"). The balkanization of the nation's stevedore market has no place in the free national system of commerce guaranteed by the dormant Commerce Clause. As Justice Jackson explained more than 50 years ago, "our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them." *H.P. Hood & Sons,* 336 U.S. at 539, 69 S.Ct. 657. The County cannot remove its port facility from the national stevedore market any more than Texas can remove its oil refineries, or California can block off its wineries, or Michigan can monopolize its auto industry. *See id.*

The problem is not, as the County suggests, that the Port of Miami can only physically accommodate a certain number of stevedores. The County certainly has a legitimate interest in having the Port operate efficiently and restricting overcapacity,

---

**7.** The parties have not contested the administrative examiner's factual findings, which, as noted earlier, have collateral estoppel effect here. Nor have they disputed the port director's undisputed testimony as to how he applied the ordinance.

**8.** Although the 1999 denial, as a substantive claim, is time-barred, evidence as to how the

ordinance was applied then is still relevant as to the remaining timely claims. *See United States v. Ashdown,* 509 F.2d 793, 798 (5th Cir.1975); *Gaston v. Home Depot,* 129 F.Supp.2d 1355, 1366–67 (S.D.Fla.2001). *See also Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038 (2d Cir.1992).

and it may be that the Port of Miami has a limited ability to support stevedores. The problem, rather, is that, for a limited number of stevedore slots, current permit holders obtain rubber-stamp renewals, while new prospective entrants do not even get their feet in the door so as to be able to compete for those limited slots. The permit ordinance mandates (and presumes) that current permit holders will have to satisfy the need requirement, but in practice they are exempted from this requirement because of the actions of the port director, the county manager, and the Board of County Commissioners. On this record, the burden imposed on commerce is "clearly excessive in relation to the local benefits created." *Diamond Waste, Inc. v. Monroe County*, 939 F.2d 941, 946 (11th Cir.1991).

Not surprisingly, local laws insulating established companies from new competition under the guise of a need assessment for new entrants have been repeatedly found to violate the dormant Commerce Clause. *See, e.g., H.P. Hood & Sons*, 336 U.S. at 545, 69 S.Ct. 657; *Walgreen*, 405 F.3d at 57–60; *Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 570–574 (4th Cir.2005); *Medigen*, 985 F.2d at 167. In *H.P. Hood & Sons*, for example, the Supreme Court reviewed a New York statute protecting established milk producers. The statute provided that a license to operate a milk plant should not be issued unless the commissioner of agriculture determined "that the issuance of the license will not tend to a destructive competition in a market already adequately served." *See* 336 U.S. at 528, 69 S.Ct. 657. In concluding that the ordinance improperly discriminated against interstate commerce, the Court recognized that the plaintiff already operated a milk plant in New York and was seeking the license for a second plant. Nevertheless, the Court reasoned that "while the state power is applied in this case to limit expansion by a handler of milk, who already has been allowed some purchasing facilities, the argument for doing so, if sustained, would be equally effective to exclude an entirely new foreign handler from coming into the state to purchase." *Id.* at 540, 69 S.Ct. 657. The Court, therefore, held that the statute violated the dormant Commerce Clause. *See id.* at 545, 69 S.Ct. 657.

Similarly, in *Yamaha Motor*, the Fourth Circuit reviewed a Virginia statute which required a need assessment before a new motorcycle dealership could be opened, and which gave existing dealerships the right to protest the opening of a new dealership in their market. When a protest was filed, the new dealership could open only upon reasonable evidence that the market could support a new dealer. The Fourth Circuit noted that the statute created a significant barrier to market entry because of the "virtual certainty" of a protest whenever a manufacturer attempted to authorize a new dealership. There was also evidence that the possibility of a protest and the required need assessment had deterred new market comers. The Fourth Circuit concluded that the statute failed under the undue burden test because the effect on interstate commerce outweighed the purported state need to prevent market saturation. *See* 401 F.3d at 571. If the statute were upheld, it would give "Virginia the green light to extend similar protection to automobile dealers and franchises of other product lines, thereby turning Virginia into an *island of economic protectionism*." *See id.* at 573–74 (emphasis added).

The admonishment of the Fourth Circuit in *Yamaha Motor* applies with equal force here. In practice current permit holders are exempted from the required need assessment when they come up for renewal. And just as the Virginia statute

allowed established motorcycle dealers to block new dealers, the stevedore permit ordinance, as applied, allows established stevedores—through their affiliates' survey responses and need assessments—to effectively block new competition. If the County can limit competition in the stevedore market at the Port of Miami to a handful of entrenched companies, then it can also limit competition at locales like the airport, thereby becoming "an island of economic protectionism."

■ The County also argues that the ordinance as applied does not burden commerce because only one out-of-state firm (Seaboard Marine) has applied for a permit within the last 10 years, and its application was granted. This argument has some superficial appeal. In *United Haulers*, for example, the Supreme Court suggested that a local law's "disparate impact on out-of-state as opposed to in-state business" was one of the factors to be considered in the undue burden analysis. *See* 127 S.Ct. at 1797. But the Court did not say that this factor was dispositive. On the contrary, the Court left open the possibility that a non-discriminatory law that removes a local market from the national market could be deemed to burden interstate commerce, irrespective of evidence of disparate impact. *See id.* The Court ultimately did not have to decide the issue, because it found that the benefits of the ordinance insulating a group of *government-owned* waste processing companies from competition outweighed any arguable burden on interstate commerce. *See id.*

Unlike the ordinance considered in *United Haulers*, the stevedore permit ordinance—as applied—protects nine privileged private stevedores, not County-owned companies. In this setting *Carbone, H.P. Hood & Sons*, and *Yamaha Motor* are the most apt precedents. *See Davis*, 128 S.Ct. at 1810 n. 9 ("Under

*United Haulers*, a governmental public preference is different from commercial private preference, and we make the governmental responsibility inquiry to identify the beneficiary as one or the other."). More importantly, the County has failed to present any public interest warranting the seemingly permanent removal of the Port of Miami's stevedore market from the local, state, and national markets. *See Brimmer v. Rebman*, 138 U.S. 78, 83, 11 S.Ct. 213, 34 L.Ed. 862 (1891) ("a burden imposed by a state upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to ... the people of the State enacting such statute").

■ The County further asserts that it has an interest in preventing destructive competition. That may be true. Yet there is no evidence in the record demonstrating that competition in the stevedore market will have a destructive effect on the Port or its operations if new applicants are allowed to compete with existing permit-holders for the available slots. In fact, the port director renewed the permits of two stevedores which were not doing any work at the Port, apparently without any deleterious effects. The County's speculation about the possibility of destructive competition is insufficient to justify the burden on interstate commerce, particularly without any supporting economic analyses or studies. *See Medigen*, 985 F.2d at 167 ("[b]ecause the 'ruinous' effects of competition are entirely speculative, their prevention cannot justify restricting market entry" under the undue burden test). Thus, there is no triable issue of fact as to whether destructive competition can justify the current application of § 28 A–6.

In sum, what the County has done is to effectively create an entrenched oligopoly, with no termination date in sight, without giving other interested stevedores an equal

opportunity to obtain a permit to work at the Port. This practice violates the dormant Commerce Clause under the undue burden test.

### 3. THE COUNTY AS A MARKET PARTICIPANT

█ A local or state government acting as a market participant, rather than as a market regulator, is not subject to the strictures of the Commerce Clause. *See White v. Mass. Council of Constr. Employers,* 460 U.S. 204, 208, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). Local ordinances or acts in the specific market in which the local government participates therefore do not violate the dormant Commerce Clause. *See S. Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 97–98, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (plurality opinion). This doctrine does not apply here, however, because the County is not a participant in the stevedore market.

█ The County owns and manages the Port of Miami, but it does not offer or provide stevedore services. Indeed, the County does not even hire stevedores. Rather, private stevedores are hired by cargo carriers and cruise lines. The County, of course, competes with facilities operated by other countries, states, counties, and municipalities, and it invests significant resources in the Port. But the market at issue in this case is not the market for port services generally, but the market for stevedores, and there is no evidence that the County is a participant in the stevedore market.

In *South Central,* a plurality of the Supreme Court rejected a similar attempt by a state to rely on the market participant doctrine. The case involved an Alaska statute requiring that state-owned timber taken from the state be processed within the state. Alaska argued that it was engaged in the direct sale of its own timber and therefore was not subject to the requirements of the dormant Commerce Clause. The plurality disagreed, and held that the market participant doctrine did not apply because Alaska was not a participant in the timber-processing market. *See* 467 U.S. at 97–98, 104 S.Ct. 2237. It reiterated that the market for purposes of the doctrine has to be narrowly defined:

> The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market.

*Id.* Otherwise, "the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry." *See id.* The plurality concluded that the dormant Commerce Clause barred Alaska's protectionist statute. *See id.*

An even more daunting obstacle for the County is the former Fifth Circuit's decision in *J.L. Smith v. Dept. of Agriculture of the State of Georgia,* 630 F.2d 1081 (5th Cir.1980), which is binding precedent in the Eleventh Circuit under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*). *J.L. Smith* involved a regulation mandating that, when conditions were crowded, space assignments in the Georgia-owned farmers' market be made on the basis of state residency, with preference given to residents of Georgia. An out-of-state farmer challenged the regulation under the dormant Commerce Clause, and Georgia asserted the market participant defense based on its ownership of the market. The Fifth Circuit rejected this defense because Georgia "neither pro-

duce[d] the goods to be sold at the market, nor engage[d] in the actual buying or selling of those goods." Georgia "simply provided a suitable marketplace for the buying and selling of privately owned goods." As such, Georgia was a market regulator, and not a market participant. *See id.* at 1083.

*J.L. Smith* is controlling here. The market participant doctrine does not help the County because the market for port services is distinct from the market for stevedore services. That the County is a participant in the market for port services and owns and operates the Port of Miami does not make the County a participant in the separate market for stevedores. The County does not offer or purchase stevedore services. Rather, like Georgia in *J.L. Smith*, the County simply provides a suitable market place that it owns—the Port—for stevedores to offer their services. Ownership of the Port does not make the County a participant in the stevedore market any more than ownership of the farmers' market made Georgia a participant in the produce market. The County's market participant defense fails as a matter of fact and law.[9]

#### 4. MUNICIPAL LIABILITY

Finally, I reject the County's argument that Florida Transportation has failed to establish municipal liability.

 A plaintiff seeking to hold a municipality liable under § 1983 must identify a municipal policy or custom that caused his injury, and cannot simply try to impose liability under respondent superior principles. *See McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir.2004) (*citing Monell v. Dept. of Social Serv.*, 436 U.S. 658,

694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In a case involving a duly enacted local law, municipal liability is established through the municipality's adoption of the purported unconstitutional law. *See, e.g., McKusick v. City of Melbourne*, 96 F.3d 478, 483 (11th Cir.1996) (municipal liability can be established "when the allegedly unconstitutional municipal action 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers' "); *Little v. City of North Miami*, 805 F.2d 962, 967 (11th Cir.1986) ("Because we conclude that the resolution in question can be fairly characterized as a 'decision officially adopted and promulgated' by the City Council of North Miami, we conclude that the minimum requirements for imposing municipal liability have been alleged."). Municipal liability is also established where a municipality's final policy makers have acquiesced in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 n. 11 (11th Cir.1991) (*citing Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

 Finally, and as relevant here, "[c]ounty liability [under § 1983] on the basis of ratification exists when a subordinate public official makes an unconstitutional decisions and when that decision is then adopted by someone who does have final policy-making authority. The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (citations omitted).

---

9. I recognize that *J.L. Smith* has been criticized by other courts. *See, e.g., Four T's, Inc. v. Little Rock Municipal Airport Comm'n,* 108 F.3d 909, 912–13 (8th Cir.1997). But that is of no matter here. If the County wishes to have the Eleventh Circuit revisit *J.L. Smith,* it will have to make that argument on appeal.

As the County notes in its motion for summary judgment, the county manager and the Board of County Commissioners had final policy-making authority with respect to stevedore permits. *See* County Memorandum [D.E. 148] at 16. *See also Rosario v. Miami–Dade County*, 490 F.Supp.2d 1213, 1222 (S.D.Fla.2007); *Hershell Gill Consulting Engineers, Inc. v. Miami–Dade County*, 333 F.Supp.2d 1305, 1333–34 (S.D.Fla.2004). Here, the County enacted the stevedore permit ordinance, and the County's admitted final policy makers acquiesced in the practice of applying the ordinance in a discriminatory fashion so as to create an undue burden for new applicants seeking stevedore permits.

From 1999 to 2005, the port director denied Florida Transportation's seven applications for stevedore permits primarily based on his need assessments. During the same period, the renewal permits of the established stevedores were automatically approved without any need assessments. The county manager explicitly acknowledged and approved this interpretation and application of the ordinance in two memoranda to the Board of County Commissioners.

For example, in his memorandum recommending that the Board affirm the denial of Florida Transportation's application in 2000, the county manager stated:

It is important to note that it has been many years since a new stevedore permit has been issued at the Port of Miami. The Port Director has determined that the current number of stevedore permits, nine (9), is the optimal number for efficient operations at the Port. It is also important to note that this is not the first time a stevedore permit has been denied. In prior years, certain stevedores have had to buy a company with an existing permit at substantial costs or wait until the Port director determined that there was a need for such. [D.E. 133–19 at 1]. Based on this recommendation, the Board of County Commissioners approved the resolution submitted by the County Manager, ratified the port director's interpretation of the ordinance, and affirmed the denial of Florida Transportation's application.

Similarly, on September 11, 2001, the County Manager forwarded to the Board of County Commissioners the port director's memorandum "indicat[ing] that present stevedore permit holders are able to adequately serve new and existing business at this time," and defended the port director's discriminatory application of the ordinance [D.E. 104–20 at 1–2]. The Board denied Florida Transportation's appeal for "the reasons stated" in the county manager's report, the port director's denial letter, and the 1999 need assessment, thereby ratifying once against the port director's actions.

When the port director denied Florida Transportation's permit applications in 2003, 2004, and 2005, he relied on the 2002 need assessment, which—like the 1999 need assessment—found that new applicants should not set a permit because the current stevedores—which had their renewal applications rubber-stamped for approval—were serving the Port's needs. This was the same unconstitutional application and rationale the Board had approved and ratified in 2000 and 2001. In sum, the denials in 2003, 2004, and 2005 were business as usual.

In light of this evidence, and the administrative examiner's finding of how the ordinance is applied, the County cannot seriously argue that there is no municipal liability here. The county manager and the Board of County Commissioners interpreted and applied the ordinance in an unconstitutional manner in 2000 and 2001,

and the port director thereafter continued to interpret and apply the ordinance as the county manager and the Board had approved. This is not a case where a municipal employee took it upon himself to improperly (and discriminatorily) apply a facially neutral ordinance while the municipality's final policy makers were kept in the dark about the unauthorized conduct. *Cf. Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637–38 (11th Cir.1991) (city not liable for mayor's alleged bribery and extortion under § 1983 because it had not adopted or ratified such illegal activities). On the contrary, the county manager and the Board learned of the port director's interpretation and application of the ordinance, they blessed that conduct and ratified it in 2000 and 2001, and the port director then continued to use the same discriminatory rationale from 2002 through 2005. On this record, the County's attempt to disavow responsibility for a practice widely accepted and ratified for years by its final policy makers is untenable. The denial of Florida Transportation's applications in 2003, 2004, and 2005 were based on a custom, policy, and/or practice of the County, which permits municipal liability under *Monell* and its progeny.

### V. CONCLUSION

In sum, the County's stevedore permit ordinance, as applied by the port director, the county manager, and the Board of County Commissioners improperly excluded Florida Transportation and other stevedores who wished to apply for new permits from the interstate stevedore market at the Port of Miami, while at the same time providing automatic renewals for the existing and entrenched stevedores. This practice cannot survive the undue burden test and, therefore, violates the dormant Commerce Clause.

Florida Transportation is entitled to summary judgment as to liability on its claims for the denial of stevedore permits in 2003, 2004, and 2005. The County is entitled to summary judgment on all other claims.